FOOD LION, INCORPORATED,
Appellee,

v.

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL–CIO–CLC, et al.,

United Steelworkers of America, AFL–CIO–CLC, et al., Appellants.

Nos. 96–7076, 96–7077 and 96–7085.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 21, 1996.

Decided Jan. 10, 1997.

Earl J. Silbert, Washington, DC, argued the cause, for appellants United Steelworkers of America and 1199 National Health and Human Service Employee Union, with whom Richard J. Oparil, Washington, DC, was on the briefs.

George Wiszynski, Washington, DC, argued the cause and filed the briefs, for appellant The Kamber Group.

Charles L. Warren, Washington, DC, argued the cause, for appellee. Richard L. Wyatt, Jr. and Larry E. Tanenbaum were on the brief. Anthony T. Pierce, Washington, DC, entered an appearance.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The two discovery disputes at issue here, which have been consolidated for appeal, arise out of an abuse of process case pending in the United States District Court for the District of South Carolina ("the abuse of process case").[1] In that pending case, Food Lion, Inc. ("Food Lion"), a grocery store chain, brought suit against the United Food and Commercial Workers International Union, AFL–CIO–CLC ("UFCW"), alleging that UFCW abused process by bringing yet another suit ("the *Bryant* litigation")[2] with the illicit "ulterior purpose" of "destroy[ing]" Food Lion, which is a non-unionized company. A0101–05 (Doc. 1, Ex. 1).

In the course of litigating the abuse of process case, Food Lion issued the two subpoenas which gave rise to the present controversies. In the first subpoena ("the Fingerhut subpoena"), Food Lion sought discovery from Fingerhut (a third-party public relations firm that served as a consultant to UFCW) which included, *inter alia*, fourth-party documents relating to other unions' "corporate campaigns" against other employers. These fourth-party documents were unrelated to either Food Lion or UFCW. Food Lion moved to enforce this subpoena in an ancillary proceeding in the United States District Court for the District of Columbia, and its motion was granted. In the March 18, 1996 order challenged here, the district court denied motions by intervenors United Steelworkers of America, AFL–CIO–CLC ("Steelworkers"), and 1199 National Health and Human Service Employees Union ("1199") to modify the court's prior order granting Food Lion's motion to compel such documents. The court refused to reconsider its prior ruling that the fourth-party documents covered by the subpoena were relevant to the abuse of process litigation and therefore must be produced by Fingerhut. A0034–35; A0036–37. The court also reaffirmed its November 14, 1995, protective order prohibiting Food Lion from using the

fourth-party documents outside of the abuse of process litigation. A0035; A0037. On appeal, appellants argue that the district court erred in holding that the fourth-party documents were relevant, and that the protective order is insufficient to safeguard the unions' confidentiality interests in those documents.

The second subpoena ("the Kamber subpoena"), issued by Food Lion to The Kamber Group ("Kamber"),[3] was substantively similar to the Fingerhut subpoena—although the district court ultimately ruled that Kamber was not required to produce documents that were unrelated to either Food Lion or UFCW. After numerous disagreements between Food Lion and Kamber about the legitimate breadth of the subpoena, Food Lion sought to enforce the subpoena in another ancillary proceeding in the District Court for the District of Columbia. On September 5, 1995, the district court granted Food Lion's motion to enforce the subpoena, and gave Kamber ten days in which to comply. A0024–25. After Kamber allegedly failed to comply with this order, the district court on March 19, 1996, granted Food Lion's motion to hold Kamber in contempt. A0038–40. The court sanctioned Kamber for failing to produce various documents in its off-site storage boxes until long after the specified deadline for producing the documents had passed. The court ordered that Kamber produce all documents covered by the order, pay $1000 per diem until the order was complied with, and compensate Food Lion for legal fees and expenses relating to Kamber's noncompliance. A0039–40. The district court has not yet issued a final order as to the extent of Kamber's liability to Food Lion. On appeal, Kamber claims that it should not have been held in contempt because the record lacked clear and convincing evidence of any bad faith on Kamber's part, and because Kamber complied fully and in

---

**1.** *Food Lion, Inc. v. United Food & Commercial Workers International Union, AFL–CIO–CLC*, No. 6:93–0582–1AJ (D.S.C.1993).

**2.** *Bryant v. Food Lion, Inc.*, C.A. No. 2–90–0505 (D.S.C.). In the *Bryant* litigation, UFCW sued Food Lion, alleging that Food Lion had violated

the Employee Retirement Income Security Act of 1974.

**3.** Kamber, like Fingerhut, was a public relations firm that advised UFCW.

good faith with the district court's order compelling production.

With regard to the Fingerhut subpoena, we conclude that the district court erred in holding that nonparty union documents unrelated to either Food Lion or UFCW were relevant for discovery purposes in the abuse of process litigation. With regard to the Kamber subpoena, we affirm the district court's decision to hold Kamber in contempt of court for its unexcused tardiness in producing documents subject to the order that were eventually found in Kamber's off-site storage. We do not address the appropriateness of the amount of damages that Kamber is obligated to pay to Food Lion in compensation for Kamber's past contempt because the district court has not yet issued a final order on this question.

## I. BACKGROUND

Both the Fingerhut and the Kamber subpoenas have complicated procedural histories. The Fingerhut controversy originated after Food Lion served the Fingerhut subpoena on December 27, 1994. On September 15, 1995, Food Lion moved to enforce the subpoena in an ancillary proceeding in the D.C. federal district court. The D.C. district court granted this motion on November 14, 1995, and issued an order directing Fingerhut to comply with the subpoena by producing not only documents relating to corporate campaigns by UFCW against other employers, but also documents relating to "corporate campaigns" of other union-clients against employers other than Food Lion. Among the other union-clients were Steelworkers and 1199, neither of which had any relationship to Food Lion. The district court also issued a protective order directing that "Food Lion shall use compelled documents that do not relate to Food Lion or the UFCW only in the litigation underlying this case." A0029.

Although the district court denied Fingerhut's motion to reconsider, it granted the

motions of Steelworkers and 1199 to intervene in the proceedings. However, on March 18, 1996, the court denied the intervenors' motions to modify its order compelling production of documents relating to these two unions. A0034–37. The court offered two rationales for its decision:

(1) "[D]ocuments related to corporate campaigns that do not involve either Food Lion or the UFCW are relevant to Food Lion's ability to demonstrate that the UFCW engaged in a corporate campaign against it because these documents may show that the types of actions engaged in by other unions in other corporate campaigns were also engaged in by the UFCW against Food Lion"; and

(2) "[B]ecause Food Lion has faced difficulty in obtaining documents related to the UFCW corporate campaign against Food Lion, documents related to other corporate campaigns will assist ... in determining what types of documents are missing from prior and future productions."

A0034, A0036. Subsequently, the two unions filed the instant appeal. On May 1, 1996, this circuit granted the unions' motions for stay of enforcement pending appeal.

The Kamber controversy arose out of a similar subpoena that was issued to Kamber by Food Lion on September 22, 1994. On January 12, 1995, Food Lion moved the D.C. district court to enforce the Kamber subpoena. Kamber responded to this motion on January 30, 1995, claiming that, subject to a single objection (involving documents unrelated to Food Lion, UFCW, or the underlying abuse of process case),[4] it had complied fully with the subpoena. A0064, A0118–19. On September 5, 1995, the district court granted Food Lion's motion to compel, overruling all of Kamber's objections and giving Kamber ten days in which to produce all documents covered by the subpoena. A0133–34.

On November 16, 1995, Food Lion moved to hold Kamber in contempt. The district

---

**4.** In its reply to Kamber's opposition, Food Lion stated that it sought only "documents concerning campaigns conducted by UFCW against other employers ..., not documents related to corporate campaigns conducted by other unions." A0084, A0411. When the district court later

entered a contempt order against Kamber, the order was not based on any failure to produce other unions' documents. A0038–39. Thus, the relevance of such documents is not at issue in the Kamber controversy.

court granted this motion on March 19, 1996.[5] At issue in the contempt ruling were a number of off-site storage boxes which Kamber allegedly neglected to search during the ten-day period specified in the order. In explaining why Kamber should be held in contempt, the court stated that, "[a]t the time of Food Lion's last filing on January 25, 1996, Kamber was just then undertaking a search of 600 boxes of documents in an off-site storage facility." A0039. The court ordered Kamber to "pay Food Lion, Inc. compensation for Food Lion's legal fees and expenses associated with obtaining Kamber's compliance with the subpoena." A0040.[6] Kamber did not file any additional documents in response to the district court's contempt order. Instead, on April 2, 1996, Kamber filed a sworn affidavit executed by its general counsel stating that Kamber's prior searches and productions had been complete and thorough, and had resulted in the production of all documents in Kamber's possession which fell under Food Lion's subpoena. Soon afterward, on April 17, 1996, Kamber appealed from the district court's contempt order, and this appeal was consolidated with the appeal arising out of the Fingerhut subpoena. This court has jurisdiction over the consolidated appeals under 28 U.S.C. §§ 1291 and 1294(1).

## II. ANALYSIS

### A. *The Fingerhut Subpoena*

■ Appellants Steelworkers and 1199 urge this court to conclude that the district court erred by ordering Fingerhut to produce fourth-party documents unrelated to either party in the underlying abuse of process litigation. They not only contend that nonparty discovery is significantly more limited than party discovery, but also that, regardless of the standard of relevance applied, Steelworkers' and 1199's documents are simply irrelevant to the question whether UFCW committed the intent-specific tort of abuse of process against Food Lion.[7]

Appellants challenge both bases of the district court's relevance ruling. First, they argue that, since the elements of the tort of abuse of process largely turn on the defendant's particular intent, the district court should have offered an explanation of how documents of Steelworkers and 1199 could lead to the discovery of admissible evidence on the intent of UFCW. Brief for Appellants, at 17. Second, appellants contest the district court's statement that discovery of these documents may help to determine what documents are missing from Fingerhut's productions involving UFCW. They claim that "the fact that one union creates or has certain 'types' of documents has no bearing on whether another union could or should have the same or even similar documents." *Id.* at 18. According to appellants, "[p]ermitting discovery on this basis would allow parties to obtain documents from non-parties based on sheer speculation." *Id.*

Food Lion, on the other hand, argues that the nonparty documents sought in the sub-

---

5. Steelworkers was also a Kamber client. Upon learning that Kamber believed that the March 19 order required Kamber to produce Steelworkers' documents to Food Lion, Steelworkers intervened in the proceeding and moved to prohibit discovery or to clarify the order enforcing the Kamber subpoena. On April 2, 1996, the district court ruled that Kamber was "prohibited from disclosing documents relating to the United Steelworkers of America." A0041.

6. Food Lion then filed a petition for approximately $100,000 in fees and expenses, but the district court has not yet ruled on this petition.

7. Appellants set forth four additional arguments as to why the Fingerhut subpoena should not be enforced insofar as it requires Fingerhut to produce these nonparty documents. First, appellants assert that Food Lion should be estopped from claiming that the Fingerhut subpoena covers such documents because of Food Lion's so-called "judicial admission" that the Kamber subpoena (which was worded almost identically to the Fingerhut subpoena in this respect) did not cover such documents. Second, they contend that "Steelworkers' and 1199's documents concerning confidential union strategies and tactics in the context of collective bargaining relationships are subject to a qualified privilege." Brief for Appellants, at 18. Third, they claim that the district court abused its discretion when it "fail[ed] to balance the alleged relevance of the documents sought against the intrusive invasion of the unions' privacy interests." *Id.* Finally, appellants argue that the district court's protective order is not adequate to safeguard the unions' confidentiality interests. We need not reach the merits of these four issues since we find that the order is invalid because the nonparty union documents are irrelevant to the underlying litigation.

poena are relevant to the underlying abuse of process litigation for exactly those reasons identified by the district court. Food Lion explains:

> Contrary to the Unions' suggestion, Food Lion is not proceeding on mere speculation. Academic studies of corporate campaigns and materials distributed by the AFL–CIO suggest that individual unions rely heavily on only a few sources, such as the Industrial Union Department of the AFL–CIO and a handful of public relations firms, to devise and implement corporate campaign strategy, and that union corporate campaigns, regardless of the specific union involved, typically involve a narrow range of identifiable tactics.

Brief for Appellee, at 17 (citing P. Jarley & C. Maranto, *Union Corporate Campaigns: An Assessment*, 43 IND. & LABOR RELATIONS REV. 505 (1990); *Developing New Tactics: Winning with Coordinated Campaigns*, Industrial Union Dep't, AFL–CIO (1985)). Thus, Food Lion alleges that documents relating to other unions' corporate campaigns are relevant because they may show that tactics used by those unions in other corporate campaigns were also used by UFCW in a campaign against Food Lion. *Id.* at 18. Additionally, although Food Lion concedes that "the non-party status of a witness may have a bearing on determining the burdensomeness of discovery [under F.R.C.P. 26(c)]," it rejects the notion that the relevance standard applied to nonparties is more stringent than that applied to parties. Brief for Appellee, at 15; *Fein v. Numex Corp.*, 92 F.R.D. 94, 96 (S.D.N.Y.1981) (". . . Rule 26(b) of the Federal Rules of Civil Procedure limits discovery to relevant matters, and makes no distinction in this regard between information in the hands of parties and that held by nonparties.").

Resolving the Fingerhut subpoena controversy requires us to explore the outer limits of the relevance inquiry in nonparty discovery. Whether the district court erred in ordering a third party to the underlying abuse of process litigation to produce fourth-party documents unrelated to either party in that litigation is a question of first impression in this circuit. Upon careful reflection, we conclude that the fourth-party documents at issue here are irrelevant and therefore vacate the district court's order enforcing Food Lion's subpoena insofar as it concerns these documents. Although we recognize that discovery in federal civil litigation casts a wide net, nevertheless there are some limits on what may be reasonably discovered.

■ Federal Rule of Civil Procedure 26(b)(1) provides in part that, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Generally speaking, "relevance" for discovery purposes is broadly construed. Under Rule 26(b), "information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." FED. R.CIV.P. 26(b)(1). Trial courts exercise considerable discretion in handling discovery matters, and a district court's decision to permit or deny discovery is reviewable only for an abuse of discretion. *Brune v. Internal Revenue Service*, 861 F.2d 1284, 1288 (D.C.Cir.1988).

Although it is rare for an appellate court to overturn a district court's decision to allow discovery, the relevance standard of Rule 26 is not without bite and may dictate no other choice. *See, e.g., Epstein v. MCA, Inc.*, 54 F.3d 1422, 1423 (9th Cir.1995) (holding that district court abused its discretion in allowing discovery of documents that "would have no bearing on either the merits of the case or on the motion for class certification" and that therefore were irrelevant under Rule 26(b)(1)). Despite the fact that "[t]he boundaries defining information that is relevant to the subject matter involved in the action are necessarily vague and it is practically impossible to state a general rule by which they can be drawn," it is also true that "[n]o one would suggest that discovery should be allowed of information that has no conceivable bearing on the case." 8 WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 2008, pp. 105–06 (1994); *see also In re Fontaine*, 402 F.Supp. 1219, 1221 (E.D.N.Y.1975) ("While the standard of relevancy [in discovery] is a liberal one, it is not so liberal as to allow a party 'to roam in

shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.'") (quoting *Broadway & Ninety–Sixth St. Realty Co. v. Loew's Inc.*, 21 F.R.D. 347, 352 (S.D.N.Y.1958)).

■ Applying these tenets to the instant case, we conclude that the documents sought by the Fingerhut subpoena are not relevant to the subject matter of the underlying litigation and thus may not be discovered by Food Lion. We fail to see any reasonable likelihood that allowing discovery of the nonparty unions' documents will lead to discovery of evidence relevant to the underlying action. Under South Carolina law, the elements of the tort of abuse of process are (1) ulterior purpose; and (2) a willful act in using process that is not proper in the regular conduct of a proceeding. As the appellants aptly point out, both of these elements turn primarily on the specific intent of UFCW in pursuing the *Bryant* litigation. Even if Food Lion were correct that the fourth-party documents at issue might lead to evidence of other corporate campaigns carried on by other unions against other employers, we do not see how this evidence would bear on UFCW's intent in carrying out the *Bryant* litigation.[8]

Indeed, in a less extreme case involving discovery of loan applications submitted by nonparties to a bank which was a party to the litigation, the District Court for the Eastern District of New York reached a conclusion similar to the one we reach today. *In re Fontaine*, 402 F.Supp. 1219 (E.D.N.Y.1975). In that case, which was decided under bankruptcy rules which incorporate by reference the relevance standard of Rule 26(b), the district court reversed an order by a bankruptcy judge permitting a defendant-debtor to inspect and copy all loan applications submitted by nonparties to the plaintiff-creditor's office during a three-month period. The creditor in the underlying controversy sought to establish that the debt of the bank-

rupt was not dischargeable because credit had been extended to him in reliance upon an intentional and material false statement in the credit application. The defendant-debtor admitted that he had made a false statement on his loan application, but denied that the creditor had relied upon that statement in extending him credit. He sought discovery of other, nonparty debtors' loan applications in order to demonstrate that the bank had not relied on his false statement. The creditor, in turn, argued that the other loan applications were "irrelevant to th[e] case since each application [was] independently considered solely on its own merit by weighing numerous variables." *Id.* at 1221.

The *Fontaine* court reversed the bankruptcy judge and disallowed discovery of nonparty loan applications, despite the fact that they were submitted to and processed by the same plaintiff bank, who was suing the defendant who issued the subpoena. The court reasoned in part that the bank's "failure to rely on similar false statements, if true, is no evidence that there was no reliance in this particular instance especially in view of the fact ... that each loan is a separate entity and is considered apart from previous applications." *Id.* The court concluded that, "[c]onsequently, there is no likelihood that useful evidence might be uncovered which is relevant to the subject matter." *Id.* In *Fontaine*, the only connection between the nonparty loan applications sought and the defendant-debtor's application were that they were handled by the same bank, and this connection alone was not enough in the court's view to establish Rule 26 relevance. Similarly here, we fail to see how the discovery of nonparty documents pertaining to 1199 or Steelworkers is germane to the abuse of process case involving UFCW and Food Lion. Even if Food Lion were able to establish that either 1199 or Steelworkers had conducted a corporate campaign against some other employer involving litigation that constituted abuse of process under South

---

**8.** The "missing documents" rationale proffered by the court is equally implausible. Undoubtedly, each public relations program designed by a firm like Fingerhut is individually tailored for the particular client. Even if some similarities could be shown among public relations campaigns handled by the same agency, these similarities would not justify a relevant inference that the same documents were produced in each campaign, and, if one or another were not found in every client's file, that they must have been removed or withheld.

Carolina law, it would still be problematic whether this happenstance would in any way pertain to UFCW's intent in conducting the *Bryant* litigation. Here, of course, there is not even the coincident of other unions using litigation as a part of their "campaigns" against other employers. Discovery of one abusive union without more cannot be used as a basis to infer another union's alleged abuse of process in a completely different factual setting, absent a stronger showing of nexus between the two unions than the fact that they both used the same public relations agency.

The *Fontaine* case highlights the problems of boundless discovery without a meaningful standard of relevance. Had the *Fontaine* court upheld the bankruptcy court's ruling, the debtor could have obtained confidential records of hundreds of loan applicants whose only connection to his case was the fact that they used the same bank. Just as menacingly here, allowing the discovery sought would enable an employer at war with an organizing union to get its hands on the documents of two completely independent unions which have absolutely no connection to that employer at all. Indeed, their only connection to the litigation is that they used the same public relations firm as UFCW, the union in contact with Food Lion. Where would the stopping-place be? If Food Lion may obtain the documents of 1199 and Steelworkers, why should it not on a similar justification also be permitted to obtain the documents of every other union client advised by Fingerhut? The definition of a "corporate campaign" set forth by Food Lion would seem to cover almost any public relations work done

by Fingerhut on behalf of virtually any union client.[9] Similarly, such a holding would presumably allow a plaintiff-client suing a tax or accounting firm for malpractice to obtain access to thousands of other people's confidential records, on the sole ground that the nonparties had the misfortune of employing the same tax or accounting firm. Such wide-ranging, intrusive, and ultimately irrelevant discovery must undeniably be found to cross the legitimate boundaries of Rule 26. Unless a movant can demonstrate a stronger nexus between third- and fourth-party documents and the elements necessary to the underlying cause of action than Food Lion has done here,[10] discovery may not be had. Accordingly, we conclude that the district court abused its discretion in allowing discovery of Fingerhut documents pertaining to 1199 and Steelworkers.

**B. *The Kamber Subpoena***

On September 22, 1994, Food Lion served Kamber with a subpoena which requested that Kamber produce, *inter alia*:

. . .

6. All documents describing, explaining, or referring to corporate campaigns, coordinated campaigns, or comprehensive campaigns.

7. All documents referring or relating to any communications between the Kamber Group and ... UFCW ... concerning corporate campaigns, coordinated campaigns or comprehensive campaigns.

8. All documents referring or relating to a corporate campaign, comprehensive campaign, or coordinated campaign and re-

---

**9.** As appellants point out, the term "corporate campaign" is not a term of art. Brief for Appellants, at 2 n.3. Indeed, the parties to this litigation have used varying definitions of the term throughout the proceedings. What is clear is that the term encompasses a wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer. These tactics may include, but are not limited to, litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state or federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public.

**10.** For example, we might have reached a different conclusion if Food Lion had plausibly alleged that a number of unions were conspiring under the aegis of a broader organization (such as the AFL–CIO) to carry on coordinated "corporate campaigns" encompassing a shared strategy of litigation conducted with the intent of harming or destroying one or a number of non-unionized employers. The allegations that corporate campaigns "rely heavily on only a few sources," *see supra* page 1012, falls materially short of the sort of showing necessary. Indeed, although both UFCW and Steelworkers are affiliated with the AFL–CIO, 1199 is not. On the record before us, we can discern no relevant connection whatsoever between UFCW and the other two unions.

lated tactics by the UFCW, or any of its locals, against Food Lion.

9. All documents relating to any services provided by the Kamber Group to the UFCW, FAST, CUE or any other person regarding Food Lion.

10. All documents referring or relating to any communications between the Kamber Group and ... UFCW ... or any other person regarding Food Lion.

...

13. All documents referring or relating to Food Lion which the Kamber Group received from, or furnished to, ... UFCW ... or any other person.

...

A0048. On September 5, 1995, in response to a motion by Food Lion, the district court issued an order directing Kamber to "conduct a full and complete search of *all* records within its possession, custody or control" and ordering that "[t]he search for and production [of] documents shall not be limited to documents pertaining to Food Lion or to Kamber personnel who have worked on matters pertaining to Food Lion." A0024 (emphasis added). The order gave Kamber ten days in which to comply, and it further stated that "[Kamber] shall produce ... all documents responsive to the subpoena, without regard to any of the objections interposed by [Kamber] and without regard to the relevance of the requested documents." A0025.

Approximately 600 boxes of Kamber documents were stored off-site with a private storage company. Following the district court's order, Kamber's general counsel Jeffrey Sandman asked Kamber's chief operating officer John W. Leslie ("Leslie") to check these boxes. Leslie and an assistant searched all the boxes whose external index descriptions mentioned either UFCW or Food Lion. A0349. But due to a faulty indexing system, a number of boxes containing documents that related to both Food Lion and UFCW were not searched, and so all relevant documents were not produced in a timely manner.

On September 15, 1996, the deadline for Kamber's production of documents under the order, Kamber delivered to Food Lion approximately 128 documents totaling 335 pages, along with a representation that those documents constituted all responsive documents. Food Lion objected that more documents must exist, and Kamber acknowledged that it was still looking for additional billing records. Kamber then filed (and subsequently withdrew) a notice of appeal from the September 5 order and a motion for stay pending appeal. After withdrawing the notice of appeal, Kamber filed a motion to hold itself in contempt (also subsequently withdrawn).[11] On November 8, 1995, Kamber notified Food Lion that, under its understanding of the term "corporate campaign," it had no documents responsive to Food Lion's requests. However, on November 10, Kamber produced another box of documents and video materials, claiming again that, with this addition, all responsive documents had been produced.

On November 16, 1995, Food Lion filed a motion for contempt against Kamber for failure to comply with the court's September 5 order. Following this motion, Kamber revealed for the first time that additional responsive documents might be found in 600 boxes in off-site storage. On November 27, 1995, Kamber produced a box of documents containing files belonging to Don McClure, a Kamber employee whom Food Lion had previously identified as extensively involved in the UFCW campaign against Food Lion.

On March 19, 1996, the district court granted Food Lion's motion to hold Kamber in contempt for violating the prior court order. In the contempt order, the district court stated:

> The Kamber Group is clearly in contempt. It never sought an extension of time for complying with the court's order;

---

11. Kamber filed this motion to hold itself in contempt so that there would be a final order from which Kamber could appeal the order to the extent that it required production of other clients' documents. It appears that Kamber withdrew this motion upon Food Lion's representation that it was not seeking those nonparty documents. Brief for Appellants, at 10. On April 9, 1996, the district court officially ruled that Kamber was "prohibited from disclosing documents relating to [Steelworkers]." A0041.

it just moves along blithely at its own pace, even as to the corporate campaigns conducted by the [UFCW] against Food Lion. Moreover, it never sought clarification as to whether the court's order required production of documents regarding other UFCW corporate campaigns that did not target Food Lion, despite its knowledge of this court's November 14, 1995, order in another case requiring such production. Giving [Kamber] the benefit of every doubt, the court will not adjudge [Kamber] in contempt for failing to produce the documents regarding UFCW not related to Food Lion....

[Kamber] has no excuse whatsoever, however, for its failure to timely produce the other subpoenaed documents. At the time of Food Lion's last filing on January 25, 1996, Kamber was just then undertaking a search of 600 boxes of documents in an off-site storage facility—more than four months after the court's order required production.

A0038–39. The district court required Kamber to pay $1000 per day until it produced all documents responsive to the September 5 order.[12] Although the court did not issue a final order as to Kamber's total liability, the court also ordered that Kamber "shall pay ... compensation for Food Lion's legal fees and expenses associated with obtaining Kamber's compliance with the subpoena" and directed Food Lion to submit documentation as to the amount of Kamber's liability. Again, we review the district court's contempt order for abuse of discretion.

■ Kamber puts forth three reasons why the district court's contempt order amounted to an abuse of discretion. First, Kamber claims that it fully complied with the district court's September 5 order, and that the record did not contain clear and convincing evidence to support a finding that Kamber had acted in bad faith. Second, Kamber claims that the district court should, as a matter of due process, have held an evidentiary hearing prior to finding it in contempt. Third,

Kamber claims that the district court's imposition of financial sanctions was unreasonable. Kamber's first two arguments are without merit.[13] Because we conclude that the district court did not abuse its discretion in finding that Kamber had violated its prior order compelling production, we affirm the contempt order insofar as it relates to Kamber's past contempt.

■ As an initial matter, we note that Kamber has misstated the standard for finding a party in contempt. Federal Rule of Civil Procedure 45(e) provides in part that, "[f]ailure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued." Under this rule, a party moving to hold another party in contempt must demonstrate by clear and convincing evidence that the alleged contemnor *violated the court's prior order. See, e.g., National Organization for Women v. Operation Rescue,* 37 F.3d 646, 662 (D.C.Cir. 1994); *Washington–Baltimore Newspaper Guild v. Washington Post,* 626 F.2d 1029, 1031 (D.C.Cir.1980). However, contrary to Kamber's contention, a finding of bad faith on the part of the contemnor is *not* required. Indeed, the law is clear in this circuit that "the [contemnor's] failure to comply with the court decree need not be intentional." *National Labor Relations Board v. Blevins Popcorn Co.,* 659 F.2d 1173, 1183 (D.C.Cir. 1981). The "intent of the recalcitrant party is irrelevant" in a civil contempt proceeding because, unlike a criminal contempt proceeding, a civil contempt action is "a remedial sanction used to obtain compliance with a court order or to compensate for damage sustained as a result of noncompliance." *Id.* at 1184; *see also McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) ("The absence of wilfulness does not relieve from civil contempt.... Since the purpose is remedial, it matters not with what intent the defendant

---

**12.** Since the district court issued its order, Kamber has produced no new documents, claiming that there are no other responsive documents in its possession.

**13.** We decline to reach the third issue because the district court has not yet issued a final order as to what damages Kamber must pay under the contempt order.

did the prohibited act.").[14]

On the other hand, an alleged contemnor's good faith is not entirely irrelevant to the ultimate determination of contempt. Several courts have held that a party charged with contempt may assert a defense of good faith substantial compliance, although at least one district court judge in our jurisdiction has questioned the viability of this defense.[15] Assuming that the defense survives in this circuit,[16] however, the burden of proving good faith and substantial compliance is on the party asserting the defense, and Kamber has failed to meet that burden in this case.

In order to prove good faith substantial compliance, a party must demonstrate that it " 'took all reasonable steps within [its] power to comply with the court's order.' " *Glover v. Johnson*, 934 F.2d 703, 708 (6th Cir.1991) (quoting *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir.1989)). Although a party's good faith may be a factor in determining whether substantial compliance occurred,[17] and may be considered in mitigation of damages,[18] good faith alone is not suffi-

**14.** The issue of whether a grant of attorneys' fees is appropriate in this case is not ripe since the district court has made no ruling on it. There is disagreement among courts as to whether a showing of bad faith or willful disobedience on the part of the contemnor is required to justify a grant of attorneys' fees. Some courts have suggested that attorneys' fees are a punitive measure that is justified only if the contemnor has willfully disobeyed a court order. *See, e.g., Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967) ("[I]n a civil contempt action occasioned by willful disobedience of a court order an award of attorney's fees may be authorized as part of the fine to be levied on the defendant."); *Spencer v. NLRB*, 712 F.2d 539, 543 n. 13 (D.C.Cir.1983) (same); *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979) ("[I]t is appropriate for the court ... to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to have been willful.").

The D.C. Circuit has not squarely ruled on whether bad faith is a prerequisite to a grant of attorneys' fees in a contempt action. However, despite the general American rule against fee-shifting, we see no reason why a district court should not be authorized to include legal fees specifically associated with the contempt as part of the compensation that may be ordered to make the plaintiff whole, even absent a showing of willful disobedience by the contemnor. Numerous courts have so held. *See, e.g., Motley v. Yeldell*, 664 F.Supp. 557, 558 (D.D.C.1987) ("[I]n a case involving civil contempt, there need be no finding of willful contempt for a Court to award Attorneys' fees and costs to the prevailing party. Although the Court of Appeals for the District of Columbia Circuit has not addressed this question, the Fifth, Sixth, Seventh and Ninth Circuits have all allowed fee awards in civil contempt proceedings in which the contempt was not found to be willful."); *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1535 (11th Cir.1986) (explaining that *Fleischmann* "did not say, and certainly did not hold, that a fee award cannot be made in the absence of willful disobedience"); *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir.1985) ("An

inflexible rule requiring the denial of fees when civil contempt is not 'willful' would prevent the party proving the contempt from being fully compensated in many cases."); *Universal Motor Oils Co. v. Amoco Oil Co.*, 743 F.Supp. 1484, 1487 (D.Kan.1990) ("Civil contempt need not be willful to justify a discretionary award of attorneys fees and expenses as a remedial measure."). *But see Omega World Travel, Inc. v. Omega Travel, Inc.*, 710 F.Supp. 169, 173 (E.D.Va.1989) (criticizing the reasoning set forth in *Motley v. Yeldell*).

**15.** *See LaShawn A. v. Kelly*, 887 F.Supp. 297, 313 (D.D.C.1995) ("The defendants argue that good faith and substantial compliance are defenses to contempt allegations. However, the cases they cite from this circuit precede [*NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C.Cir. 1981),] and thus do not control.").

**16.** Although *Blevins Popcorn* did not specifically address the possibility of a substantial compliance defense, several subsequent district court decisions support the defense's continuing availability. *See, e.g., Feeling v. Kelly*, 152 F.R.D. 670, 675 (D.D.C.1994) (recognizing a defense of substantial compliance to a charge of contempt); *Morgan v. Barry*, 596 F.Supp. 897, 899 (D.D.C. 1984) (post-*Blevins Popcorn* opinion holding that defendants' claim of "substantial compliance" with a court order was "a defense to a charge of contempt"); *Brotherton v. Lehman*, 40 Fair Empl. Prac. Cas. (BNA) 1306, 1984 WL 66, *4 (D.D.C.1984) (unreported opinion) (post-*Blevins Popcorn* opinion stating that, "either substantial compliance or inability to comply is a complete defense in a civil contempt proceeding.").

**17.** *See, e.g., Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union*, 531 F.2d 617, 621 (D.C.Cir.1976) ("Evaluation of good faith efforts to comply, once raised, is necessary to determine the possibility of compliance.").

**18.** *See, e.g., NAACP v. Brock*, 619 F.Supp. 846, 850 (D.D.C.1985) ("[G]ood faith compliance efforts or a party's inability to comply with a

cient to excuse contempt. *See, e.g., Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 547 F.2d 575, 581 & n. 5 (D.C.Cir. 1977) (as amended) (holding that, at least in the second-stage of a contempt proceeding, "good faith or lack of wilfulness is not a defense that the petitioner must negate"); *Doe v. General Hospital,* 434 F.2d 427, 431 (D.C.Cir.1970) (holding that physician's good faith misunderstanding as to scope of preliminary injunction did not constitute a defense to a civil contempt order for violating that injunction).

Kamber claims that it complied fully and in good faith with the district court's September 5 order, because "[a]ll documents Kamber discovered during searches of its files were produced to Food Lion by September 15, 1995." Brief for Appellant Kamber Group, at 3. According to Kamber, the record "demonstrates that Kamber conducted a complete, thorough and good faith search for all responsive documents in its possession and produced them." *Id.* at 14. Kamber concedes that it did not search all of its off-site boxes within the time specified in the order, but protests that even its incomplete and tardy search of the off-site storage boxes was "not in the least bit contumacious or taken in bad faith" since at the start "Kamber conducted a search of all of its off-site boxes that, based on its index, might have

reasonably contained responsive documents." *Id.* at 10.

In addition, Kamber suggests that it should be excused from any violation of the court order because it relied on the representations of opposing counsel in determining the breadth of its original search. With regard to the contested "off-site" documents that were found after the September 15 deadline, Kamber asserts that, "Kamber offered to hire temporary employees to review each file in every box [the 500 additional off-site storage boxes]." *Id.*[19] Kamber claims that Food Lion declined this offer (a claim which Food Lion does not specifically contest), but later reversed its position: after filing a motion to hold Kamber in contempt on November 16, 1995, Food Lion subsequently (in late December 1995) "reversed its position on Kamber's documents stored off-site and requested Kamber to hire temporary employees to search each of the remaining 500 off-site boxes." *Id.*

Notwithstanding Kamber's contrary assertions, we conclude that the district court judge acted within his discretion in holding Kamber in contempt.[20] The record contains clear and convincing evidence that Kamber violated the September 5 order by—at the very least—failing to search or to notify the district court of the existence of the 600 off-site storage boxes containing documents covered by the September 5 order until two months after the order issued.[21]

court's orders [may serve as] defenses which call for mitigation of contempt sanctions.").

**19.** Approximately 100 of the off-site storage boxes (those whose indices showed that they would have documents covered by the order) were searched initially. Kamber fails in its brief to take account of the fact that its offer to search the remaining 500 boxes was not made until November 1995, two months after the September 15 deadline.

**20.** Incidentally, we note that the record before us suggests that both parties to this litigation have carried out discovery in a most adversarial fashion. Although Kamber ended up as the party held in contempt, the record indicates that Food Lion is far from an innocent and itself engaged in many questionable tactics directed against Kamber and causing it unnecessary delay and expense. That being said, however, it is well-established that a district court has wide discretion to use its inherent authority in an effort to encourage the opposing parties to cooperate res-

ponsibly with timely discovery efforts. The district court may, for example, determine that sanctioning one misbehaving party will help to facilitate the litigation, even if the other party has also engaged in unacceptable conduct. The appellate court may not substitute its judgment for the district court's as to the winner of the booby prize for civility, but may only ensure that the district court did not abuse its substantial discretion.

**21.** Food Lion asserts a number of additional reasons why the contempt order was justified, including various instances of alleged stonewalling by Kamber. These included Kamber's failure to produce various billing records in a timely manner and its purported ignorance as to the meaning of the phrase "corporate campaign" as it related to the production of various public relations documents. The only reason specifically cited by the district court for the contempt order was Kamber's tardy production of documents from the off-site storage facility (although Food Lion argues that this failure may not have

Moreover, Kamber failed to prove that it complied substantially and in good faith with the order. The district court's order clearly directed Kamber to search *all* of its records. A0024. Kamber did not seek a clarification of this order, nor did it ask for an extension of the September 15 deadline for compliance.[22] Yet Kamber failed to search its off-site boxes and to produce documents in those boxes that were clearly covered by the September 5 order. Although it is true that Kamber eventually searched some of the boxes and offered to search the rest of the boxes whose indices did not specifically indicate that they contained documents covered by the order, these actions came too late: the September 5 order indicated that all documents were to be produced by September 15.[23] Kamber knew of the existence of the off-site boxes and knew that some of the boxes contained documents covered by the court order. We can see no reason why Kamber should not have searched and produced all documents responsive to the order that were contained in those boxes.

Kamber cannot be excused on the grounds that its filing system for the off-site storage proved faulty. For one thing, there is evidence in the record showing that Kamber knew that its indexing system was defective from the outset. Indeed, a Kamber executive acknowledged that Kamber had never assigned anyone "to make uniform, consistent or accurate the descriptions entered in the index."[24] Yet, despite this awareness that its indexing system was flawed, Kamber waited until late November, well after the September 15 deadline had expired, to inform Food Lion of the off-site boxes and to offer to review the contents of all such boxes. Were we to excuse compliance with a subpoena on the basis of such neglectful management practices, future courts would be deluged with litigants blaming "faulty" record systems for noncompliance. If the search required by the order was truly burdensome, Kamber should have raised this concern in a timely manner with the district court.[25]

■ Kamber's second claim, that it should have been afforded a separate evidentiary hearing on the contempt issue, is also without merit. In this circuit, "[e]very civil contemnor who asserts a genuine issue of material fact is entitled to a full, impartial hearing." *Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union,* 531 F.2d 617, 620 (D.C.Cir.1976); *see also Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook Railroad*

been the only reason for the court's action). In our view, the reason cited by the district court was alone sufficient to justify the contempt order. Thus, we do not reach the issue whether the other uncooperative tactics cited by Food Lion and contested by Kamber would have justified the order.

22. At one point, after the September 15 deadline, Kamber did file an appeal from the order (limited to the question of whether Kamber was required to produce documents of clients other than the UFCW that were unrelated to Food Lion). That appeal is irrelevant to the issues under consideration here, which revolve around whether Kamber produced all UFCW documents in its possession that related to Food Lion.

23. Similarly, Kamber cannot now argue that it complied with the order merely because Food Lion informally acquiesced in a narrower search than the court had ordered. Kamber's offer to search the rest of the off-site boxes and Food Lion's alleged statement that this search was unnecessary did not take place until long after the September 15 deadline had passed, so they are largely irrelevant to whether Kamber was in contempt.

24. A0349. John Leslie, Kamber's executive vice president, stated in a sworn declaration that:

The entries on the index are provided by individual employees who designate the documents and files for off-site storage. For the most part, the descriptions are not very informative. To my knowledge, Kamber has never had any administrator or other employee assigned to verify box contents, or to make uniform, consistent or accurate the descriptions entered in the index.

A0349.

25. Kamber asserts as one reason why it should not be held in contempt that Food Lion "flip-flopped" in its interpretations of the Kamber subpoena, alternately claiming that the subpoena covered or did not cover documents pertaining to Kamber clients other than UFCW. We are not persuaded by this argument. The contempt order was not based upon Kamber's failure to produce documents unrelated to UFCW or Food Lion (indeed, it was not even based on Kamber's failure to produce UFCW documents related to employers other than Food Lion). Rather, it was based upon Kamber's failure to produce documents related to both Food Lion and UFCW that were clearly covered by the subpoena.

*Co.,* 380 F.2d 570, 581 (D.C.Cir.1967) (as amended) ("If ... appellants raised a genuine issue of fact regarding compliance [with a court order], they were entitled to a hearing on that issue."). However, the fact that Kamber failed to search and produce documents from the off-site boxes during the ten-day period specified in the district court's order is not in dispute. This failure alone justified the contempt order and negated any substantial compliance or impossibility defense. Thus, Kamber was not entitled to a hearing.

Accordingly, we affirm the district court's decision to hold Kamber in contempt of court because of its failure to produce all responsive documents or to seek modification or clarification of the September 5 order by the September 15 deadline.

### III. CONCLUSION

For the foregoing reasons, we vacate the order compelling Fingerhut to produce non-party union documents, but we affirm the district court's order holding Kamber in contempt for failure to comply with a prior court order.

*So ordered.*