**Dr. Wen Ho LEE, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al., Defendants.**

**No. CIV.A.99–3380 TPJ.**

United States District Court, District of Columbia.

Aug. 18, 2004.

such individual is being sanctioned in the amount of $250,000.

Allyson Newton Ho, Jones Day, Washington, DC, Brian A. Sun, Jones Day, Heather Hersh Gilhooly, Liner Yankelevitz Sunshine & Regenstreif, LLP, Los Angeles, CA, Luan K. Phan, O'Neill, Lysaght & Sunn LLP, Santa Monica, CA, Thomas Charles Green, Sidley Austin Brown & Wood, Washington, DC, Erica Lynn Reilley, Jones Day, Los Angeles, CA, Frank R. Volpe, Joseph R. Palmore, Mark D. Hopson, Sidley Austin Brown & Wood, LLP, Betsy Alexandra Miller, Jones Day, Washington, DC, for Plaintiff.

Anthony Joseph Coppolino, Elizabeth J. Shapiro, Marcia N. Tiersky, Washington, DC, for Defendant.

Charles D. Tobin, Ethan Ray Arenson, Holland & Knight, LLP, Floyd Abrams, Donald John Mulvihill, Cahill Gordon & Reindel LLP, Washington, DC, Joel Kurtzberg, Cahill, Gordon & Reindel, New York, NY, Lee J. Levine, Seth D. Berlin, Levine Sullivan & Koch, LLP, Washington, DC, David A. Schulz, Levine Sullivan Koch & Schulz, LLP, New York, NY, Kevin T. Baine, Kevin Hardy, Williams & Connolly LLP, Washington, DC, for Movants.

## MEMORANDUM & ORDER

JACKSON, District Judge.

This case is presently before the Court on the sole issue of whether certain nonparty journalists[1] should be held in civil contempt for failing to comply with the Court's Memorandum & Order of October 9, 2003 (the "October 9th Order") to reveal to plaintiff so-called "confidential sources" who are officers or agents of defendants. For the reasons explained below, the Court finds (and so adjudges) each of the

---

**1.** The journalists are Bob Drogin of the *Los Angeles Times,* H. Josef Hebert of the Associated Press, Jeff Gerth and James Risen of the *New York Times,* and Pierre Thomas, a former CNN reporter who now works for ABC News.

Walter Pincus of the *Washington Post* (who became subject to the October 9th Order as of June 24, 2004) is not presently before the Court, having yet to be deposed in accordance with the October 9th Order.

journalists in civil contempt of the October 9th Order, imposes a fine on each of $500 per day (payable to the United States) until such time as he complies therewith but stays the same pending appeal, and defers the issue of whether plaintiff may be entitled to any compensatory sanction award until the conclusion of this litigation.

## I.

On October 9, 2003, the Court denied the journalists' motions for protective orders, and ordered that they appear for their depositions and "... if asked, truthfully answer questions as to the identity of any officer or agent of defendants, or any of them, who provided information to them directly about Wen Ho Lee, and as to the nature of the information so provided ...." *See* October 9th Order at 17. The journalists filed motions requesting that the Court amend and/or certify the Order for immediate appeal. Without waiting for a disposition on the motions, however, all of the journalists filed notices of appeal on November 10, 2003. On November 13, 2003, the Court issued an order denying the journalists' motions for leave to appeal, and ordered that they appear by counsel to set dates certain for depositions. The journalists subsequently withdrew their notices of appeal. At a status conference on December 4, 2003, the parties and journalists represented that, consistent with the October 9th Order, they would schedule depositions of the journalists to begin the week of December 15, 2003, to conclude by mid-January 2004. At the ensuing depositions, the journalists (as expected) declined to reveal their confidential sources.

Plaintiff subsequently filed his "Application for an Order to Show Cause Why Non–Parties James Risen, Jeff Gerth, Robert Drogin, Josef Herbert and Pierre Thomas Should Not Be Found in Civil Contempt," along with a "Motion To Compel Further Deposition Testimony From Non–Party Journalist Walter Pincus," in which he requested that the Court resolve the motion to compel Pincus prior to issuing an order to show cause. By Order dated June 24, 2004, the Court granted the motion to compel further deposition testimony from Walter Pincus, granted plaintiff's application for an order to the other journalists to show cause, and scheduled a hearing on the issue of contempt for August 18, 2004, which has just been concluded.

The journalists make somewhat overlapping arguments about why there should be no finding of contempt. The Court addresses their arguments individually:

### Jeff Gerth

Gerth first asserts that he should not be held in contempt because, in response to multiple questions, he answered that he did not have knowledge of the identity of confidential sources. Plaintiff contends that Gerth is not being truthful, and for support points to (1) Gerth's contrary deposition testimony: "Q: Did you on occasion during the Wen Ho Lee case obtain classified information from various sources? A: Yes." (*See* Gerth Dep. at 34:4–24), (2) James Risen's testimony that he and Gerth "each had [their] own sources in connection with preparing [the March 6, 1999] story" (Risen Dep. at 68:24–69:5), and (3) the fact that Gerth, when asked whether the sources for the article "included employees of the FBI," invoked the privilege rather than responding that he didn't know. (Gerth Dep. at 53:24–54:5.) Although a finding of contempt would not be warranted where a witness truthfully asserts that he does not know the information, the Court does not address that issue because Gerth's profession of ignorance is not credible and his invocation of the privilege (as discussed below) does warrant a finding of contempt.

Gerth next contends that when he did invoke the reporter's privilege, he did so only because it pertained to confidential sources who provided information on subject matters other than plaintiff.[2] Specifically, Gerth says that at the same time he was reporting on plaintiff, he was also reporting on the unrelated investigation of one "Peter Lee," who pled guilty to attempting to pass classified information to China in 1985 and making false statements about a trip to China in 1997;[3] Gerth alleges that the " 'sweepingly broad' definition of the term 'Wen Ho Lee case' ... reasonably led Mr. Gerth to believe that he was being asked to divulge information about confidential sources" who provided information on the other "Lee." Gerth Response at 15. The argument strains credulity. Gerth knew he was attending a deposition about Wen Ho Lee that was conducted by Wen Ho Lee's counsel. Indeed, just prior to invoking his privilege, he asked for and received clarification of the term "Wen Ho Lee case." *See* Gerth

Dep. at 53:4-5. Despite having been requested by plaintiff's counsel at the outset of the deposition to request clarification if needed, he did not mention Peter Lee until near the very end of the deposition, and then his testimony suggested that he had not been thinking of Peter Lee until that point:

> Well, in conjunction with [the confidential document] ... I do now have my memory refreshed, and what I remember, what I'm remembering ... I was working on another espionage investigation coincidentally involving someone also named Lee, but Peter Lee .... And I also remember that from again, from this [document], that I was in contact with the FBI in connection with the Peter Lee case, which was virtually my responsibility while Mr. Risen was doing most of the reporting on Dr. Wen Ho Lee's case.[4]

Even if there were a genuine misunderstanding as to which "Lee" he was being asked about, Gerth has had ample oppor-

2. The testimony is as follows:

A: Can you phrase the question pertinent— I'm very, having a hard time dealing with Wen Ho Lee case because it seems to me to be a sloppily defined thing that can range over years ... as opposed to a specific article or a specific time frame, and the broader your definition, the harder it is for me to answer the question.
Q: Well, I think I defined it before, but I'll take another stab at it. For any of the reporting you did between January of 1999 and the end of 2000 that related in any way to subject matters that involved Dr. Lee, namely, his alleged mishandling of classified information at the Los Alamos lab, or allegation that he had divulged secrets regarding the W–88 to the Chinese government, okay, any reporting that you did in connection with that subject matter, did you talk to sources both on and off the record?
A: Yes.
Q: And these sources included employees of the FBI?
A: At ths point, I'm going to respectfully decline to answer your question on various

grounds, including the First Amendment and federal common law and the shield, state shield laws. (Gerth Dep. at 53:3–54:5); *see also id.* at 60:16—25: Q: "[W]ith respect to any confidential sources that you talked to in connection with any article you wrote or co-authored between 1999 and 2000 that refers to ... Dr. Lee in any way, that you are declining to identify the confidential sources? A: Within the rubric of that sweeping definition, yes.")

3. Although the investigations were unrelated, both Peter Lee and Wen Ho Lee were mentioned in the same article on three occasions. *See* Gerth's Response at 6.

4. The Court has not been able to independently verify this testimony, it appearing that the relevant pages (which were redacted but included as Ex. 7 to Gerth's response) were inadvertently omitted from the copy of the deposition that was provided to the court. Gerth and plaintiff, however, agree that this testimony appeared on p. 107 of Gerth's deposition.

tunity to supplement the record since. In any event, it is worth noting that Gerth subsequently stated that his "intention is not to divulge" confidential sources—period. (Gerth Dep. at 62:6–10.)

*James Risen*

 Risen contends that he should not be held in contempt because none of plaintiff's questions called upon him "to divulge the identity of an officer or agent of defendants who provided information to him about Dr. Lee" or "implicate[d] the Privacy Act. . . ."[5] (Risen Response at 5.)

The argument is untenable. Risen invoked the privilege numerous times in response to questions that sought the identity of his confidential sources indisputably connected with defendants, including:

> In this investigation, you talked with employees of the FBI? (Risen Dep. at 38:25–39:2); [I]n connection with this, your investigation of Dr. Lee and the subject matter surrounding his case, you had communications with officials from the Department of Energy? (*id.* at 39:3–7); And same question with respect to the Department of Justice . . .? (*id.* at 39:8–12); Is it true that Secretary Richardson went off the record, provided you that information regarding Dr. Lee's identity, and then went back on the record during the course of your interview with him in connection with that article? (*id.* at 150:17–24); Is it true that [DOE employee] Mr. [Notra] Trulock was a source for some of the information contained in the March 6th article? (*id.* at 86:12–17); What officials provided you that information [*i.e.*, "the FBI administered a second test, and officials said the suspect was found to be deceptive"] that

is contained in this paragraph? . . . Were those officials employed by the FBI? . . . Were these officials employed by the Department of Energy? (*id.* at 93:6–24); The next paragraph talks about [how] FBI officials acknowledged last week they did not have enough information then to arrest Mr. Lee but hoped that their questioning would lead to a break. Who at the FBI told you this information? (*id.* at 104:2–10). *See generally* Pl.'s Reply, Ex. K at 1–10 (providing non-exhaustive list of questions Risen refused to answer).

Also unavailing is Risen's contention that the information sought did not implicate the Privacy Act. The October 9th Order required Risen to "answer questions as to the identity of any officer or agent of defendants, or any of them, who provided information. . . ." October 9th Order at 17. The Order did not allow the journalists to make *ad hoc* determinations about whether information responsive to questions about identity would or would not implicate the Privacy Act. As the Court noted in the October 9th Order, much personal information about plaintiff was made public by the media, and plaintiff alleges that he can establish that this information originated in Privacy Act-protected records (Pl.'s Reply at 8). Only the journalists can testify as to whether or not defendants were the sources.[6]

*Pierre Thomas*

Thomas invoked the privilege and refused to answer the following: "In connection with your work on Dr. Lee's matter . . . were there off-the-record interviews done with Secretary Richardson?" (Thom-

---

5. Risen also contends that he subsequently withdrew 17 assertions of the privilege after the deposition (Risen Response at 2); however, plaintiff does not rely upon these withdrawn assertions in seeking a finding of contempt. (Pl's Reply at 6 n.3.)

6. At oral argument on August 18, 2004, Risen's counsel conceded Risen was in violation of the October 9th Order and stands on his First Amendment privilege alone in opposing a finding of contempt.

as Dep. at 22:23–23:10); "And in connection with your work on Dr. Lee's matter did you ever communicate with Mr. Curran?" [7] (*id.* at 23:18–21); "Were the sources [of the allegation that investigators were unable to account for copies of computer files containing secret nuclear codes] employed by the Department of Energy, the Federal Bureau of Investigation, or the Department of Justice?" (*id.* at 47:6–48:1; *see also id.* at 48:17–49:6) (refusing to disclose "law enforcement sources" for allegation that plaintiff copied the codes), and 51:13–52:9 (refusing to disclose whether source for information about charging plaintiff came from DOJ, DOE, or FBI).

█ Thomas contends that he is not required to answer these questions because they seek information beyond the scope of the October 9th Order. He contends in relevant part that the information he reported—including information about missing computer tapes—was not "personal or private, much less acutely hurtful." (Thomas Response at 9.) Hurtful or not, the October 9th Order was not so conditioned; it required the disclosure of "the identity of any officer or agent of defendants, or any of them, who provided information to them directly about Wen Ho Lee, and as to the nature of the informa-

tion so provided . . . ." October 9th Order at 17.

Thomas also contends that the journalists should not be "punished" for protecting confidential information. He cites cases that stand for the proposition that the press cannot be successfully sued for publishing truthful information that it has lawfully obtained. (Thomas Response at 20.) The cases are inapposite here, and beg the question. Plaintiff is not seeking to "punish" the journalists for publishing the information; rather, he seeks an order of contempt because they will not reveal sources that they have been ordered to reveal so that he might establish his Privacy Act claim against the defendants.

*Josef Hebert*

Hebert concedes that at least four of the questions to which he invoked the privilege asked what the Court had ordered him to answer.[8] Hebert response at 5. Nonetheless, he contends that he should not be held in contempt for invoking the privilege because all the information about plaintiff that he published in his stories had already been released to the public, and therefore anything his confidential sources had told him was nothing more than confirmation of information that was already in the public domain.[9] He also contends that plaintiff

7. Curran was an FBI employee on loan to the DOE.

8. Hebert refused to answer questions about whether he communicated with FBI employees, with DOE employee Ed Curran, with FBI employee Neil Gallagher, and whether his sources were employed by the government defendants. (*See* Hebert Dep. at 19:2–6, 26:5–9, 47:23–25, 48:18–23, 56:19–23, and 58:9–11).

9. Hebert cites *Barry v. United States Dep't of Justice,* 63 F.Supp.2d 25 (D.D.C.1999) for the proposition that a subsequent disclosure of information that has already been widely disclosed to the public does not violate the Privacy Act. In that case, J. Robertson held that the

DOJ did not violate the Act when it posted on the Internet an internal report that had already been leaked to the press by several Congressmen. Id. at 27–28. That case is inapposite here. The issue is not whether *Hebert* violated the Privacy Act, but whether Hebert's sources were governmental defendants who violated the Act.

Indeed, it is worth noting that according to Hebert's own timeline, plaintiff's name had been made public only two hours before Hebert published his report. (Hebert's Response at 10.) In other words, plaintiff's name was in all likelihood not public at the time Hebert learned it from a confidential source, and that source may well have been the source of leaks to the other journalists.

has not exhausted his alternative sources. Finally Hebert contends that the Privacy Act does not preclude the release of information of public importance, although he concedes that the government was not free to release all the information it had about plaintiff. (Hebert Response at 16.) The Court rejected similar arguments made by the journalists in its October 9th Order.

Finally, Hebert requests that the Court exercise its discretion and not hold him in contempt.

*Bob Drogin*

■ As do his fellows, Drogin first contends that he did not violate the Court's October 9th Order in invoking the privilege because the questions were not limited to information about plaintiff and were therefore beyond of the scope of the Order. Drogin invoked the privilege in response to the following questions, among others:

· In connection with your work for the stories you wrote concerning Dr. Lee, did you conduct interviews ... with ... Secretary Richardson that were ... part off the record ...? (Drogin Dep. at 14:15–24); In connection with your work on Dr. Lee's case, did you conduct with any government employee or official an interview that was ... partly off the record? [Yes] And who were the government employees with whom you conducted such interviews? (*id.* at 16:6–19); When you say that you did not mean to identify any employees at the FBI or the DOE or the DOJ or any of the individuals we have discussed as confidential sources, by that you don't mean to rule them out as confidential sources? In other words, you are simply not revealing the identity of those sources? (*Id.* at 109:2–25).

These questions, however, including questions about whether there were bifurcated interviews (part off and part on the record), are clearly designed to elicit information about the identity of the confidential sources who are affiliated with defendants.

Drogin next contends that he cannot be held in contempt because the information sought was privileged. He urges the Court to reconsider its ruling in light of the "changed facts" that exist now that the deposition has been taken, although it is unclear what "facts" have changed other than that the depositions have been taken and the reporters have asserted their privilege. Finally, like Hebert, Drogin requests that the Court exercise its discretion and not hold him in contempt.

## II.

■ Having found the journalists in civil contempt, the Court must impose an appropriate sanction. Plaintiff suggests (1) a fine payable to the government in order to coerce the journalists into compliance with the Court's October 9th Order, and (2) a compensatory award payable to plaintiff himself to compensate him for both attorneys' fees and costs associated with litigating this collateral discovery issue, as well as to compensate him for the "increase[d] litigation costs and ... evidentiary burden" that will "inevitably" result from the journalists' non-compliance. Pl.'s Reply at 24.[10] He also requests that the Court not stay any award pending appeal, but does not cite any authority for this request.

The journalists submit that any contempt fine should be nominal. They cite two cases in which the court imposed fines of $1.00 per day, and state that a nominal amount—if any—is appropriate in light of the constitutional issues involved and the

---

**10.** Plaintiff did not submit any record support for his request for a compensatory award but states that he can make one available upon

request. He also does not explain how he will quantify the damage arising from his "increased evidentiary burden."

fact that a contempt citation is the only procedural means for them to appeal the October 9th Order. The two cases cited by the journalists, *United States v. Cutler*, 6 F.3d 67, 70 (2d Cir.1993) and *United States v. Cuthbertson*, 630 F.2d 139, 143 (3d Cir.1980), however, do not stand for the proposition that a *de minimis* fine is appropriate where constitutional issues are involved. The courts in those cases affirmed the district courts' findings that the journalists in those cases were in contempt, but did not address the appropriateness of the fines. And indeed, the journalists' argument that the fine should be nominal where constitutional issues will be presented on appeal can be addressed simply be staying the fine pending appeal.

On the other hand, two of the cases advanced by plaintiff to support the $1,000 a day fine he seeks are distinguishable because they involve journalists refusing to comply with grand jury proceedings in high profile *criminal* investigations. In *In re Special Counsel Investigation*, 332 F.Supp.3d 33, 2004 WL 1775928 (D.D.C. 2004), Chief Judge Hogan imposed a $1,000 a day fine on a reporter who refused to comply with grand jury subpoenas in connection with a special investigation of the disclosure of the name of a covert CIA operative; and in *In re Special Proceedings*, 373 F.3d 37 (1st Cir.2004), the court upheld the $1,000 a day fine over the journalist's complaint that it was too "punitive." And in *Food Lion, Inc., v. United Food and Commercial Workers International Union, AFL–CIO–CLC, et al.*, 103 F.3d 1007 (D.C.Cir.1997), the court upheld a fine of $1,000 a day in a commercial case where there was evidence of bad faith and the court found that there was " 'no excuse, whatsoever, for [the] failure to timely produce the other subpoenaed documents.' " *Id.* at 1016 (quoting district court). Here, of course, there is no pending criminal investigation, and the journalists undoubtedly have a good faith belief in the appropriateness of their constitutional arguments.

The Court has broad discretion in fashioning an appropriate contempt sanction. The $1.00 a day suggested by the journalists strikes the Court as being insufficient to ever coerce compliance; on the other hand, the $1,000 a day suggested by plaintiff seems too punitive given the circumstances. Splitting the difference, the Court will impose a fine of $500.00 per day, and will stay the fine pending a timely appeal. As for plaintiff's request for a compensatory sanction, the Court will deny this request without prejudice to its renewal at the conclusion of this litigation when the record is complete.

In accordance with the foregoing, it is, this 18th day of August 2004,

ORDERED and ADJUDGED that the respondent journalists are, each of them, in civil contempt of the Order of this Court of October 9, 2003, and are each fined the sum of $500.00 per day, payable to the United States, until he complies therewith; and it is

FURTHER ORDERED, that the foregoing fines are stayed for thirty (30) days, or until completion of proceedings on a timely appeal herefrom, whichever is the later; and it is

FURTHER ORDERED, that plaintiff's application for a compensatory award of sanctions is denied without prejudice.