United States Court of Appeals
 for the district of columbia circuit
 

Argued July 21, 1998 Decided August 3, 1998

 In re: Sealed Case No. 98-3077
 

Consolidated with
98-3078, 98-3079, 98-3081

On Petition for Writ of Mandamus

 Kenneth W. Starr, Independent Counsel, argued the cause for petitioner, with whom
Donald T. Bucklin, Scott T. Kragie, and Andrew W. Cohen were on the petition and reply.

 David E. Kendall argued the cause for respondent William J. Clinton, with whom
Nicole K. Seligman, Max Stier, Robert S. Bennett, Carl S. Rauh, Amy Sabrin, Katharine S.
Sexton, W. Neil Eggleston, William J. Murphy, and William Alden McDaniel, Jr., were on
the response.

 Before: Wald, Silberman, and Henderson, Circuit Judges.

 Opinion for the Court filed Per Curiam.

 Per Curiam: The Independent Counsel (IC) petitions for a writ of mandamus
directing the district court to vacate its orders authorizing [ 
 ] to subpoena documents from the IC, conduct
limited depositions of the IC and his staff, and subpoena the IC and his staff for similarly
limited testimony at a show cause hearing relating to alleged violations of the grand jury
secrecy rule. We conclude that we have power to determine the issues presented by the
petition; resolving those issues in a substantially different way than the district court did, we
issue the writ.

 I.
 [ 
 ] filed motions in the district court requesting that the court order Independent
Counsel Kenneth W. Starr to show cause why he, and/or his staff, should not be held in
contempt for violation of Federal Rule of Criminal Procedure 6(e)(2), which prohibits
attorneys for the government from disclosing confidential grand jury information. The
movants alleged that the IC and his staff had divulged such information to the press, and
provided the court with several news reports about the investigation wherein a reporter
describes the source of the information as, to quote one illustrative example, "a source close
to Starr." Appendix to Opposition to Emergency Motion to Stay the District Court's Orders,
at Tab 1 (Thomas Galvin, Monica Keeping Mum--For Now Fends Off Query On Internal
Affairs, Daily News, Jan. 23, 1998, at 26). The district court held that such news reports
established a prima facie case of a violation of Rule 6(e)(2) because the "media reports
disclosed information about 'matters occurring before the grand jury' and indicated that the
sources of the information included attorneys and agents of the Government." Order to
Show Cause, Misc. No. 98-55 (June 19, 1998), at 2 (quoting Barry v. United States, 865
F.2d 1317, 1321 (D.C. Cir. 1989)).
 The district court read our decision in Barry as holding that once a prima facieviolation of Rule 6(e)(2) is established, the court is required to conduct an adversarial
hearing at which the prosecutor must show cause why he should not be held in contempt. 
Order to Show Cause at 9, (citing Barry, 865 F.2d at 1321). Accordingly, the district court
issued the two procedural orders at issue in this petition. The court first scheduled a show
cause hearing. Order to Show Cause at 10. In the second order, it clarified the nature of the
show cause hearing. The IC was ordered to produce, on July 11, the documents requested
by movants, with any Rule 6(e) material redacted. The court ruled that movants would be
permitted to depose the IC and several of his staff, prior to the adversarial hearing, on three
subject areas: (1) the IC's policy regarding press contacts, (2) actual contacts with the press
by the IC or his staff, and (3) specific representations made by the IC about the first two
subject areas. The court further ruled that movants could subpoena the IC and several of his
staff for testimony at the show cause hearing, with the subject matter of the questioning to
be limited in the same manner as during the depositions. Mem. Order, Misc. No. 98-55
(June 26, 1998), at 2. Finally, the court set forth the procedure to be followed at the show
cause hearing: the hearing would begin with an ex parte presentation by the IC of any Rule
6(e) material the IC deems necessary to rebut the prima facie case; after the IC's
presentation, movants' counsel would join the hearing, cross-examine the IC and his
witnesses, and present their evidence. See id. at 4. 
 The IC filed a notice of appeal, followed by a motion for stay pending appeal. The
district court subsequently declined to stay its orders, reasoning that the factors for granting
a stay pending appeal were not met. Order, No. 98-55 (July 9, 1998). Specifically, the court
found that the IC's likelihood of prevailing on the merits of its appeal was low given the
court's conclusion that the orders are not even appealable; that the IC would not be
irreparably harmed by the orders because the orders allowed him to redact any Rule 6(e)
material and thus he would not be required to provide any confidential investigative material
to movants; that the harm to movants of granting a stay was substantial because without an
immediate show cause hearing, there would be no deterrence of future leaks in the interim
before the appeal; and that the public interest in stopping leaks and in preserving respect for
the judiciary's orders sealing grand jury proceedings outweighed any delay that might be
caused by the show cause hearing and its associated discovery process.
 On July 9, 1998, the same day the district court denied the IC's motion for a stay
pending appeal, the IC petitioned us for mandamus relief. Because discovery was set to
begin on July 11, we ordered an administrative stay of the district court's procedural orders
so that we would have sufficient opportunity to consider the merits of the petition for writ
of mandamus. Order, No. 98-3077 (July 10, 1998). We now conclude that we have power
to determine the issues presented in the petition; based on our analysis of those issues, we
issue the writ.

 II.
 The writ of mandamus has been described as "an extraordinary remedy, to be
reserved for extraordinary situations." Gulfstream Aerospace Corp. v. Mayacamas Corp.,
485 U.S. 271, 289 (1988) (citing Kerr v. United States Dist. Court, 426 U.S. 394, 402
(1976)). As we recently observed, liberal use of the writ would "undercut the general rule
that courts of appeals have jurisdiction only over 'final decisions of the district courts,' 28
U.S.C.  1291, and would lead to piecemeal appellate litigation." In re Minister
Papandreou, 139 F.3d 247, 249 (D.C. Cir. 1998). Not surprisingly, the extraordinary nature
of mandamus relief is reflected in the strict criteria for its issuance: Mandamus will issue
only if the petitioner bears his "burden of showing that the petitioner's right to issuance of
the writ is clear and indisputable," Gulfstream, 485 U.S. at 289 (citation and internal
quotation marks omitted), and that "no other adequate means to attain the relief" exist, Allied
Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 35 (1980). See Papandreou, 139 F.3d at 250.

 A.
 We take the latter requirement first. Respondent, referring us to our opinion in In re
Kessler, 100 F.3d 1015 (1997), urges that petitioner has an adequate alternative means to
challenge the district court's discovery orders. As respondent correctly observes, we stated
in Kessler that "in the ordinary case, a litigant dissatisfied with a district court's discovery
order must disobey the order, be held in contempt of court, and then appeal that [final] order
on the ground that the discovery order was an abuse of discretion." Kessler, 100 F.3d at
1015; see also Papandreou, 139 F.3d at 250 ("If held in contempt, a litigant then has a final
order from which he may appeal, asserting any legal flaws in the underlying discovery
order."); In re: Sealed Case, 141 F.3d 337, 339 (D.C. Cir. 1998). Respondent argues that
the disobedience and contempt path to appeal is an adequate means to relief, and that
petitioner must therefore pursue it rather than seeking the extraordinary writ of mandamus.
 Unfortunately, in Kessler, Papandreou, and In re: Sealed Case, the parties did not
bring to our attention a longstanding distinction between civil and criminal contempt orders
issued against a party to a litigation. While a criminal contempt order issued against a party
is considered a final order and thus appealable forthwith under 28 U.S.C.  1291, Bray v.
United States, 423 U.S. 73, 76 (1975); Matter of Christensen Eng'g Co., 194 U.S. 458, 461
(1904); SEC v. Simpson, 885 F.2d 390, 395 n.7 (7th Cir. 1989), a civil contempt order
issued against a party is typically deemed interlocutory and thus not appealable under 28
U.S.C.  1291, Fox v. Capital Co., 299 U.S. 105, 107 (1936); Doyle v. London Guar. &
Accident Co., 204 U.S. 599 (1907); International Ass'n of Machinists & Aerospace Workers
v. Eastern Airlines, Inc., 849 F.2d 1481, 1484 (D.C. Cir. 1988); Duell v. Duell, 178 F.2d
683, 687 (D.C. Cir. 1949) (describing the rule as "thoroughly settled"); In re Joint E. & S.
Dists. Asbestos Litig., 22 F.3d 755, 765 (7th Cir. 1994). Indeed, we reaffirmed the rule that
a civil contempt order issued against a party is not appealable as recently as SEC v.
Finnegan, No. 97-5272, 1998 WL 65530, at *1 (D.C. Cir. Jan. 13, 1998).
 The confusion in our caselaw may be a product of several factors. For one, the
authoritative Supreme Court cases on these issues are rather old and are not frequently cited. 
For another, the distinction between civil and criminal contempt orders for purposes of
appealability by a party has been criticized, see Powers v. Chicago Transit Auth., 846 F.2d
1139, 1141 (7th Cir. 1988) (noting that although "many modern commentators believe that
the rule postponing review [of a civil contempt order issued against a party] is unduly harsh,
. . . the rule is too well established to be changed by us."); cf. 15B Charles Alan Wright,
Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure  3917,
at 399-404 (2d ed. 1992) (reviewing the policy debate on the merits of the distinction),
especially in light of the different regime for non-parties that allows immediate appeals from
orders of either civil or criminal contempt, Petroleos Mexicanos v. Crawford Enters., Inc.,
826 F.2d 392, 398 (5th Cir. 1989); United States v. Columbia Broad. Sys., 666 F.2d 364,
367 n.2 (9th Cir. 1982) (citing cases). Most likely, our questionable assumption in Kessler,
Papandreou, and In re: Sealed Case can be traced to an imprecise footnote from which we
quoted: "As a general rule, a district court's order enforcing a discovery request is not a
'final order' subject to appellate review. A party that seeks to present an objection to a
discovery order immediately to a court of appeals must refuse compliance, be held in
contempt, and then appeal the contempt order." Church of Scientology of Calif. v. United
States, 506 U.S. 9, 18 n.11 (1992) (citing United States v. Ryan, 402 U.S. 530 (1971)). On
its face, this passage suggests that any contempt order issued against a party, whether civil
or criminal, is an appealable final order. But it is rather implausible that the Supreme Court,
in dicta--not to mention in a footnote--meant to overrule sub silentio the holdings in Fox and
Doyle. Moreover, the case relied on by the Supreme Court, United States v. Ryan, 402 U.S.
530 (1971), is inapposite. Ryan involved a recipient of a subpoena duces tecum issued by
a grand jury, who sought to appeal from the district court's denial of a motion to quash the
subpoena. The Court held that such an order is not appealable, and that appeal could only
be taken from a contempt order that would follow from a refusal to produce the documents
requested in the subpoena. Id. at 552. It did not distinguish civil from criminal contempt,
for there was no need to do so. The case involved a recipient of a grand jury subpoena, not
a party-litigant, and so did not implicate the Doyle rule.
 In any event, we need not definitively resolve the apparent conflict in our cases as to
whether a civil contempt order issued in the context of an ongoing civil litigation is
appealable as a final order. It is enough for us to observe that there is substantial doubt
whether, if squarely presented with the issue, we would deem such a civil contempt order
appealable. Given a district court's discretion whether to hold a party who refuses to comply
with a discovery order in civil or criminal contempt, "a party who wishes to pursue the
disobedience and contempt path to appeal cannot know whether the resulting contempt order
will be appealable." Wright, Miller & Cooper  3914.23, at 146. The implication, of
course, is that the disobedience and contempt route to appeal cannot be labeled an adequate
means of relief for a party-litigant. So too here. The discovery order addressed to petitioner
arises out of a civil proceeding ancillary to a grand jury investigation, Barry, 865 F.2d at
1321-22, and petitioner is properly characterized as a party in that civil proceeding. 
Petitioner cannot know, ex ante, whether refusal to comply with the discovery order will
result in a civil contempt order or a criminal contempt order. The uncertainty of this means
to relief bespeaks its inadequacy in this case.
 Our conclusion that the disobedience and contempt path to appeal is inadequate does
not answer whether some other means to relief--besides the writ of mandamus--is adequate
for petitioner. Presumably, a civil contempt order, if issued against petitioner at the
conclusion of the ancillary civil proceeding, would constitute a final order, appealable under
28 U.S.C.  1291; it would not be like the civil contempt orders we discussed above that
arise in the course of an ongoing litigation. The Rule 6(e)(2) ancillary civil proceeding we
established in Barry is a peculiar creature in this regard; the raison d'etre of the proceeding
is a determination by the district court whether or not to hold the prosecutor in civil
contempt. Respondent argues, therefore, that petitioner must wait until the conclusion of
this ancillary civil proceeding and, if found in civil contempt at that point, seek to appeal the
discovery orders.
 The inadequacy of this alternative is apparent upon consideration of the nature of the
harm that petitioner alleges will occur if we allow the procedural orders to stand. Petitioner
contends that if he discloses [
 ]the grand jury's investigation may be irreparably harmed. In this respect, petitioner is
asserting something akin to a privilege insofar as "once [the] putatively protected material
is disclosed, the very right sought to be protected has been destroyed." In re Ford Motor
Co., 110 F.3d 954, 963 (3d Cir. 1997) (citation omitted); see also Papandreou, 139 F.3d at
251 ("Disclosure followed by appeal after final judgment is obviously not adequate in such
cases--the cat is out of the bag."). Although we have not had occasion to address the issue
of irreparable harm to law enforcement from disclosure of arguably "privileged" material
in the context of a mandamus petition, our sister circuits have concluded that such harm
renders appeal after final judgment an inadequate means to relief from the discovery order. 
See In re Department of Justice, 999 F.2d 1302, 1305 (8th Cir. 1993) (district court had
ordered the FBI to turn over documents compiled for law enforcement purposes and
assertedly privileged under FOIA, which, if released, would have irreparably harmed
ongoing law enforcement proceedings); In re Attorney Gen. of the United States, 596 F.2d
58, 60 (2d Cir. 1979) (district court had ordered the Attorney General to release files
disclosing the names of confidential government informants, arguably protected under the
informant's privilege and which, if released, might have had immediate adverse effects on
law enforcement and intelligence-gathering).
 Petitioner submits, moreover, that the district court's procedural orders, because they
involve discovery and an adversarial hearing, will cause significant delay to petitioner's
grand jury investigation as compared to the proposed alternate procedure of an ex partepresentation to the district court or a special master. In this respect, too, the type of harm
petitioner alleges is irreparable: the burden of discovery and of the adversarial hearing is
immediate and could not be recompensed were petitioner successful in appealing the
procedural orders as part of an appeal from a final judgment of civil contempt. Petitioner,
in effect, is claiming an immunity from discovery and adversarial process while the grand
jury investigation is in progress. Thus, this case is similar to Papandreou, 139 F.3d at 250,
in which we observed, in the course of issuing a writ of mandamus to vacate discovery
orders implicating sovereign immunity, that the infliction of the "burdens" of discovery
might cause irreparable harm to one who asserts an immunity from those very burdens.
 Finally, respondent contends, relying on our decision in In re United States, 872 F.2d
472 (D.C. Cir. 1989), that the IC has the alternative remedy of seeking relief from the district
court from discovery that the IC is able to demonstrate will disclose grand jury or
investigative secrets. In In re United States, the district court had expressed a willingness
to determine in camera, item-by-item, whether the state secrets privilege protected from
discovery certain materials requested by a plaintiff suing the government under the Federal
Tort Claims Act, and to allow the government to redact names from certain documents. We
denied the government's petition for mandamus, in part because "[t]he district court did not
reject the Government's assertion of privilege; on the contrary, . . . the court demonstrated
a perceptive understanding of and wholesome respect for the state secrets." Id. at 478. 
Respondent argues that the district court here has demonstrated a similar willingness to
accommodate petitioner's concerns about the confidentiality of the grand jury investigation: 
the district court has ordered that "discovery [is] restricted to matters not covered by Rule
6(e)," Mem. Order (June 26, 1998), at 2, and that "[i]f it becomes necessary for the OIC to
present material covered by Rule 6(e) during the [show cause] hearing, the OIC may submit
it to the Court at a bench conference or by other appropriate means," id. at 4.
 We think, however, that unlike the district court's procedural protections in In re
United States, the district court's safeguards here do not go far enough to assure us that the
district court will protect the confidentiality interests of the IC. For example, even if the IC
redacted the content of communications with members of the press to omit grand jury
material, the residual information regarding the identity of the contact and the time such
contact was made would give rise to inferences about the substance of "matters occurring
before the grand jury." Furthermore, the IC is not troubled solely by the possibility that Rule
6(e) material might be disclosed, but also by the prospect of disclosing even the identities
of members of the press with whom the IC and his staff have spoken[
 ]. The district court's order does
not accommodate this concern. Rather, it explicitly designates "actual contacts with the
press by OIC employees," Mem. Order (June 26, 1998), at 2, as one of the subject areas on
which respondent will be permitted to question petitioner and his staff by deposition and at
the show cause hearing. And the district court's order does not assuage petitioner's fear that
discovery and an adversarial hearing will divert petitioner's focus--significantly more so
than would an ex parte presentation--from directing the grand jury investigation at a crucial
juncture. 

 B.
 That petitioner has no adequate means of relief besides mandamus does not conclude
our inquiry into whether we have power to address the merits presented by the petition. We
must further determine whether petitioner has carried his "burden of showing that [his] right
to issuance of the writ is clear and indisputable." Gulfstream, 485 U.S. at 289 (citations
omitted); see also Papandreou, 139 F.3d at 250. On its face, this criterion is somewhat
circular. The right to issuance of the writ must be "clear and indisputable," but criteria for
determining whether a petitioner has a right to issuance of the writ at all--let alone one that
is clear and indisputable--are conspicuously absent from this formulation.
 The Supreme Court in Schlagenhauf v. Holder, 379 U.S. 104 (1964), described one
category of cases for which mandamus is appropriate, a category into which we think the
case at bar fits exactly. In Schlagenhauf, the district court, pursuant to Federal Rule of Civil
Procedure 35, ordered a defendant in litigation arising out of a bus accident to submit to
mental and physical examinations by several doctors. The defendant petitioned the Seventh
Circuit to issue a writ of mandamus vacating the district court's order, claiming that Rule
35 authorized mental and physical examinations only of plaintiffs, not defendants. Whether
Rule 35 could be applied to a defendant was a "basic, undecided question"; only one federal
case had touched on the issue, and only one state case had ever ordered the mental or
physical examination of a defendant. Id. at 110. The Seventh Circuit thought it had power
to review the question presented by the petition. The Supreme Court agreed, holding that
"the petition was properly before [the Seventh Circuit] on a substantial allegation of
usurpation of power in ordering any examination of a defendant, an issue of first impression
that called for the construction and application of Rule 35 in a new context." Id. at 111
(emphasis added). We have described Schlagenhauf as authorizing consideration of a
petition for writ of mandamus "when the appellate court is convinced that resolution of an
important, undecided issue will forestall future error in trial courts, eliminate uncertainty and
add importantly to the efficient administration of justice." Colonial Times, Inc. v. Gasch,
509 F.2d 517, 524 (D.C. Cir. 1975).
 The appropriate procedural framework for the Rule 6(e)(2) ancillary civil proceeding
we recognized in Barry is as "important" and "undecided" today as was the proper
interpretation of Rule 35 at the time Schlagenhauf arose in 1964. We provided scant
guidance in Barry on the proper conduct of the Rule 6(e)(2) proceeding. And although the
Eleventh Circuit has set forth in significant detail a procedural framework for a Rule 6(e)(2)
proceeding akin to the one we recognized in Barry, see United States v. Eisenberg, 711 F.2d
959, 964 (11th Cir. 1983), it is the only case we could find that has done so. The importance
of the grand jury to the enforcement of the federal criminal law is well documented, and the
impact on an ongoing grand jury investigation of a burdensome discovery process and
adversarial hearing, through which [ ] learn of confidential investigative material--even
if not Rule 6(e) material--could be profound. Accordingly, we have power "to determine
. . . the issues presented by the petition for mandamus," Schlagenhauf, 379 U.S. at 111, and
we turn to the merits to evaluate whether petitioner has a clear right to the issuance of the
writ.

 III.
 A. The Nature of the Proceeding
 In this circuit, the scope and nature of proceedings to enforce Rule 6(e)(2) are
governed by our opinion in Barry. In Barry, we outlined the basic framework governing
actions brought under Rule 6(e)(2):
 It is generally understood that a prima facie case of a violation
 of Rule 6(e)(2) is made when the media reports disclosed
 information about "matters occurring before the grand jury" and
 indicated that the sources of the information included attorneys
 and agents of the Government. Once a prima facie case is
 shown, the district court must conduct a "show cause" hearing
 to determine whether the Government was responsible for the
 pre-indictment publicity and whether any information disclosed
 by the Government concerned matters occurring before the
 grand jury. At this hearing, the burden shifts to the Government
 to come forward with evidence to negate the prima facie case. 
 If after such a hearing the trial court determines that remedial
 action is warranted, it may order the Government to take steps
 to stop any publicity emanating from its employees.

Barry, 865 F.2d at 1321 (citations, footnote, and internal quotation omitted). Barry thus
envisions that a two-step analysis will be employed to determine whether a violation of Rule
6(e)(2) has occurred. First, the district court must determine whether the plaintiff has
established a prima facie case. This determination will typically be based solely on an
assessment of news articles submitted by the plaintiff; indeed, we acknowledged in Barrythat a Rule 6(e)(2) plaintiff could not be "expected to do more at this juncture of the
litigation" given that he or she would "almost never have access to anything beyond the
words of the [news] report." Id. at 1326 (internal quotation omitted) (alteration in the
original). Second, if the court determines that a prima facie case has been established, the
burden shifts to the government to "attempt to explain its actions" in a show cause hearing. 
Id. at 1325. If the government fails to rebut the prima facie case, a violation of Rule 6(e)(2)
is deemed to have occurred. Cf., e.g., Duplan Corp. v. Deering Milliken, Inc., 540 F.2d
1215, 1220 (4th Cir. 1976) (noting that a prima facie showing "subject[s] the opposing party
to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted"). The
court then determines what remedy will be sufficient to deter further leaks. The remedy
may be the imposition of civil contempt sanctions or equitable relief or both, "depending
upon the nature of the violation and what the trial court deems necessary to prevent further
unlawful disclosures of matters before the grand jury." Barry, 865 F.2d at 1323. 
Significantly, in establishing this two-step framework, Barry said nothing about the burden
shifting back to the plaintiff after the government's presentation or about the plaintiff
retaining the burden of persuasion after a prima facie case has been established. See id.(noting that purpose of show cause hearing is to permit the government to respond; "if the
Government fails in its defense," the trial court should consider appropriate relief); cf.
Combs v. Ryan's Coal Co., Inc., 785 F.2d 970, 984 (11th Cir. 1986) ("The party seeking the
contempt citation retains the ultimate burden of proof. . . ."). Under Barry, then, the
plaintiff's burden is minimal; the responsibility of coming forward with evidence to rebut
the accusation of unauthorized disclosure lies squarely with the government, the party in
"the best position to know whether [it is] responsible for a violation of the Rule." Barry,
865 F.2d at 1326 (internal quotation omitted). If, of course, the government convinces the
trial judge that no violation of Rule 6(e)(2) has occurred, that is the end of the proceeding.
 Here, the IC does not contest the district court's finding that the movants have
satisfied their burden to establish a prima facie case through the submission of various news
articles indicating that information relating to grand jury proceedings or witnesses was
obtained from sources associated with the IC or that a show cause hearing is now required
under Barry. The IC does, however, object strenuously to the discovery procedures set forth
by the district court in its order governing the conduct of the show cause hearing--in
particular, the requirement that the IC be required to produce documents sought by the
movants, submit to depositions of employees listed by the movants, and respond to
subpoenas for live testimony at the hearing. (The IC has stated his willingness, however,
to submit any information or testimony in any form required to the district court in an in
camera proceeding.) The only issue before us, it is worth emphasizing, is not whether a
show cause hearing will go forward in the district court as to whether the IC or members of
his staff have made unauthorized disclosures to the press but rather the manner in which the
hearing will be conducted: as a full-scale adversarial evidentiary proceeding or as an in
camera inquiry by the trial judge and/or any special master or counsel it might appoint to
assist the court in the task. Our review of the district court's orders is a fairly deferential
one. In general, district courts are accorded a wide degree of latitude in the oversight of
discovery-related proceedings, and we review orders pertaining to discovery only for abuse
of discretion. See, e.g., Laborers' Int'l Union of N. Am. v. Department of Justice, 772 F.2d
919, 921 (D.C. Cir. 1984) ("Control of discovery is a matter entrusted to the sound
discretion of the trial courts."). We are acutely aware that in this matter in particular the job
of supervising the grand jury has been an arduous one requiring many interventions by the
trial court, which has met its duties with admirable dedication and expedition. Nonetheless,
the appropriate procedure for a Rule 6(e)(2) hearing is a matter of grave importance, not
only for this proceeding but for future ones, involving the need to protect the secrecy of the
grand jury itself as well as the need to efficaciously remedy violations of that secrecy
prohibited by Rule 6(e)(2). Accordingly, in this opinion we will lay down what we conclude
is the appropriate way to conduct such a show cause proceeding.
 Barry itself provided little in the way of a roadmap to assist the district court in
proceeding once a prima facie case is made, that is, it did not address the specifics of how
the show cause hearing should be conducted. It did not, for example, indicate whether the
hearing should be open to the public or sealed, whether or to what extent discovery should
be permitted and by whom, whether the hearing should include live testimony or rely solely
on documentary evidence, or how to minimize any risk that the hearing will result in the
disclosure of Rule 6(e) material to unauthorized recipients. In order to resolve these critical
questions, we must balance two somewhat competing concerns, both of which lie just
beneath Barry's surface. We begin with the recognition that Barry held that a proceeding
to enforce the secrecy mandate of Rule 6(e)(2) is civil in nature and may be initiated by a
private plaintiff. The movants in this proceeding have, however, seized on this "civil"
characterization to argue that, pursuant to the Federal Rules of Civil Procedure, which
generally govern civil actions for civil contempt, see 3 Charles Alan Wright, Federal
Practice and Procedure  705 (1982), they are entitled to broad discovery against the
IC, including the opportunity to require production of and to review documents from the IC
and to subpoena and question the IC and members of his staff about the alleged
unauthorized disclosures involved in the news articles that formed the basis of the primafacie case. See, e.g., Degen v. United States, 517 U.S. 820, 825-26 (1996) (noting that in
a civil case, "a party is entitled as a general matter to discovery of any information sought
if it appears 'reasonably calculated to lead to the discovery of admissible evidence'")
(quoting Fed. R. Civ. P. 26(b)(1)). In most proceedings characterized as "civil," this
would certainly be the case: An overriding interest in the revelation of truth creates a need
for free and open access to evidence; indeed, we have called it a "hallmark of our adversary
system that we safeguard party access to the evidence tendered in support of a requested
court judgment" and noted that the "firmly held main rule" is that "a court may not dispose
of the merits of a case on the basis of ex parte, in camera submissions." Abourezk v.
Reagan, 785 F.2d 1043, 1060-61 (D.C. Cir. 1986), aff'd by an equally divided court, 484
U.S. 1 (1987) (citations omitted). Exceptions to this rule are few and narrow. Id.
 We ultimately conclude, however, that the unique nature of a Rule 6(e)(2) show cause
hearing requires such an exception. This is not a typical civil proceeding between two
disputants; rather, it resembles more clearly an ancillary proceeding to a criminal grand jury
inquest. To the extent that sanctions are requested to deter future leaks (and the remedy is
thus prospective and prophylactic, rather than retrospective and punitive), a Rule 6(e)(2)
action is indeed civil in nature. See Barry, 865 F.2d at 1324; see also Gompers v. Buck's
Stove & Range Co., 221 U.S. 418, 441 (1911) (civil contempt sanctions are "remedial, and
for the benefit of the complainant," while criminal contempt sanctions are "punitive, to
vindicate the authority of the court"). But the way in which the proceeding is conducted
must acknowledge the essential nature of the proceeding as one designed to guard the
sanctity of the grand jury process itself. Thus, Barry describes a Rule 6(e)(2) plaintiff as
having only "a very limited right to seek injunctive relief or civil contempt of court through
the district court supervising the grand jury." McQueen v. United States, 1998 WL 217538,
at *7 (S.D. Tex. Mar. 30, 1998) (citing Barry). The plaintiff in a Rule 6(e)(2) suit would
not, of course, be entitled to seek monetary damages or attorneys' fees and costs from an
errant prosecutor, even though such damages are commonly awarded in civil contempt
actions. See, e.g., Clark v. Library of Congress, 750 F.2d 89, 103 (D.C. Cir. 1984) (holding
that sovereign immunity "bar[s] suits for money damages against officials in their official
capacity absent a specific waiver by the government") (emphasis omitted); see also Barry,
865 F.2d at 1321-22 (noting only that Rule 6(e)(2) permits "equitable relief, either in
addition to, in conjunction with or in lieu of contempt sanctions"); McQueen, 1998 WL
217538, at *8 (monetary damages unavailable under Rule 6(e)(2)); cf. United States v.
Waksberg, 112 F.3d 1225, 1226 (D.C. Cir. 1997) ("One of the permissible purposes of civil
contempt sanctions is to compensate the complainant for losses sustained, through a fine
payable to the complainant.") (internal quotation omitted); Food Lion, Inc. v. United Food
& Commercial Workers Int'l Union, 103 F.3d 1007, 1017 n.14 (D.C. Cir. 1997) (same as
to fees and costs). In truth, like a habeas corpus proceeding, a Rule 6(e)(2) civil action is
something of a hybrid: although initiated by a private plaintiff, it is designed to be a
supplementary means of enforcing the rules of a criminal proceeding. Cf. Santana v. United
States, 98 F.3d 752, 754 (3d Cir. 1996) (noting that the nature of habeas corpus cases is "not
adequately captured by the phrase 'civil action'; they are independent civil dispositions of
completed criminal proceedings"). A Rule 6(e)(2) proceeding, dealing as it does with the
substance of an ongoing criminal grand jury investigation, must be fully cognizant of the
interests underlying that concurrent criminal proceeding.
 The Supreme Court "consistently ha[s] recognized that the proper functioning of our
grand jury system depends upon the secrecy of grand jury proceedings," Douglas Oil Co.
of Calif. v. Petrol Stops N.W., 441 U.S. 211, 218 (1979), "a long-established policy . . . older
than our Nation itself," Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 399
(1959) (internal quotation omitted). Rule 6(e)(2), by reinforcing this need for secrecy,
protects several interests of the criminal justice system:
 First, if preindictment proceedings were made public, many
 prospective witnesses would be hesitant to come forward
 voluntarily, knowing that those against whom they testify would
 be aware of that testimony. Moreover, witnesses who appeared
 before the grand jury would be less likely to testify fully and
 frankly, as they would be open to retribution as well as to
 inducements. There also would be the risk that those about to
 be indicted would flee, or would try to influence individual
 grand jurors to vote against indictment. Finally, by preserving
 the secrecy of the proceedings, we assure that persons who are
 accused but exonerated by the grand jury will not be held up to
 public ridicule.

Douglas Oil, 441 U.S. at 219. Thus, there are obvious risks of disclosure of grand jury
material posed by translating normal discovery techniques or routine cross-examination of
witnesses by all participating parties into Rule 6(e)(2) proceedings. Because a violation of
Rule 6(e)(2) requires that the disclosure concern "matters occurring before the grand jury,"
see Barry, 865 F.2d at 1321; Fed. R. Crim. P. 6(e)(2), the IC may defend against an
allegation of an unauthorized disclosure in the press by asserting that the information
reported is, in fact, not a matter before the grand jury. In order to do so, however, he may
well need to explain what material was before the grand jury. Even the fact that the
"leaked" material was not relevant to the investigation could itself be quite revealing, and
certainly admissions that grand jury material was disclosed would be useful to witnesses
who might be recalled. The possibility that document production, depositions, and cross-
examination of government prosecutors would result in a disclosure of Rule 6(e) material
clearly increases the risk of "[a greater] number of persons to whom the information is
available (thereby increasing the risk of inadvertent or illegal release to others), [and thus]
renders considerably more concrete the threat to the willingness of witnesses to come
forward and testify fully and candidly." United States v. Sells Eng'g, Inc., 463 U.S. 418,
432 (1983) (rejecting automatic disclosure of grand jury materials to government civil
attorneys). Moreover, if discovery and examination of government witnesses through
depositions and in court were routinely available in Rule 6(e)(2) suits, targets and witnesses
would surely be encouraged to bring such proceedings in the hope of obtaining information
as to the course of the grand jury's investigation whenever the relatively low threshold of
a prima facie case attributing the source of a "leak" to the prosecutor was met. Cf. id. at 432
("If prosecutors in a given case knew that their colleagues would be free to use the materials
generated by the grand jury for a civil case, they might be tempted to . . . start or continue
a grand jury inquiry where no criminal prosecution seemed likely."). The advantage of
cross-examining government agents involved in an ongoing investigation about whether a
"leak" of grand jury information has occurred cannot be overstated, particularly in cases of
large-scale public interest. At the very least, if discovery or cross-examination in a Rule
6(e)(2) proceeding were allowed to proceed along its usual course, it would almost certainly
result in the release of the names of the government agents involved in the investigation as
well as the names of members of the press with whom they have been in contact [
 ]. Short of a blanket denial
of any press contacts at all, it would seem to us to be virtually impossible for IC personnel
to answer movants' questions about whom they talked to, where, and about what without
disclosing details of the investigation that tread perilously near to or in fact step over the line
into areas of grand jury secrecy. Even if the specifics of information discussed with
members of the press were redacted to omit grand jury material (and it is hard to see what
use the questioning would be if the answers were so limited), the fact that the redaction was
made at all would give rise to inferences about the substance of grand jury material when
put together with the context of the answer and the identity of the media representative who
authored it. Moreover, even if certain information discussed with members of the press
regarding the course of the investigation, such as investigative leads ultimately not pursued,
was considered not to be "matters occurring before the grand jury" and thus would not be
subject to redaction, its revelation would still provide useful clues as to the direction of the
prosecutors' efforts. In sum, we cannot envision how a useful inquiry could be conducted
about what the IC or members of his staff told the press about certain matters relevant to the
grand jury's investigation without disclosing the focus of the investigation (or, minimally,
the areas or individuals not being focused on). We must conclude, therefore, that the
drafters of Rule 6(e)(2) intended that proceedings to ferret out violations of the grand jury
secrecy rule should not themselves present an undue risk of compromising that very secrecy. 
See, e.g., McQueen, 1998 WL 217538, at *9 ("[L]iberal discovery rules in civil suits . . .
would expose grand jury deliberations, the identity of grand jurors, and other grand jury
members to the public. This would not only inhibit the grand jury's deliberative process,
it would potentially expose grand jury members, government lawyers and agents, and
witnesses to outside pressures and possible danger. In short, it would eviscerate the very
protections to the grand jury process Rule 6 was intended to provide."); Blalock, 844 F.2d
at 1559 n.19 (Tjoflat, J., specially concurring) (inquiry into status of grand jury's
investigation, "especially when conducted in the context of an adversarial civil contempt
proceeding, would inevitably lead to the disclosure of grand jury matters, the very vice Rule
6(e)(2) was designed to avoid"); Donovan v. Smith, 552 F. Supp. 389, 390 (E.D. Pa. 1982)
(denying defendants' request to depose lead government attorney and thereby "intrud[e] into
his knowledge regarding the prosecution of this action").
 There is a further impediment to treating a Rule 6(e)(2) proceeding in all respects like
a typical civil adversarial proceeding. It would almost certainly engage the district court and
the prosecutor in lengthy collateral proceedings and in so doing divert the grand jury from
its investigation. How, for instance, could counsel for a Rule 6(e)(2) plaintiff be permitted
to engage in discovery and in-court examination of government witnesses without granting
the government's attorney a similar opportunity to depose movants' counsel, movants'
associates, and, indeed, the movants themselves if they could be shown to have relevant
information about how the leaks really occurred? After all, if the government seeks to prove
that it is not the source of the information reported, it has an interest in identifying the true
source. By setting forth a simple, two-step framework, we believe Barry sought to achieve
a swift resolution of an alleged Rule 6(e)(2) violation and to put an immediate stop to any
leaks while not unduly interfering with the work of the grand jury with a full-blown sidebar
trial on the Rule 6(e)(2) issue. See Barry, 865 F.2d at 1326 (show cause hearing "carries
little threat of conflict with the grand jury proceedings") (internal quotation omitted); cf.
United States v. Dionisio, 410 U.S. 1, 17 (1973) ("Any holding that would saddle a grand
jury with minitrials . . . would assuredly impede its investigation and frustrate the public's
interest in fair and expeditious administration of the criminal laws."); Eisenberg, 711 F.2d
at 966 (targets should not be permitted access to information that "would permit them to
embark upon a broad scale investigation of their own").
 Given the lack of guidance in Barry on how to conduct the rebuttal phase of a Rule
6(e)(2) inquiry, it is not surprising that the district court proceeded as it did. Nevertheless,
we believe that the risks of even inadvertent disclosure of grand jury matters and the specter
of unnecessary detraction from the main business of the grand jury's investigation are simply
too serious to allow the movants[
 ]full access to all relevant materials produced by the government or to let them conduct
direct or cross-examination of government investigative personnel during ongoing grand
jury proceedings. In our view, Barry did not contemplate such an adversarial evidentiary
hearing as the next stage following a prima facie case. Indeed, we have been hard pressed
to find any case in which a Rule 6(e)(2) proceeding has been conducted in such a manner;
in all reported cases brought to our attention, in camera and/or ex parte proceedings have
been the norm. See, e.g., Eisenberg, 711 F.2d at 966 (prohibiting preindictment
participation by targets); Barry v. United States, 740 F. Supp. at 888, 894 (D.D.C. 1990)
(district court holds government's documentary submission sufficient to rebut prima faciecase); Donovan, 552 F. Supp. at 390 (court holds in camera proceeding in which
government responded to questions submitted to court by defense counsel and by court); see
also Paul S. Diamond, Federal Grand Jury Practice and Procedure  10.02 (3d ed.
1997) ("It is rare indeed for a court to require that the government meet its burden under
Rule 6 by presenting the testimony of its attorneys and agents, thus subjecting them to cross-
examination. There is obvious potential for defense abuse of the government and
interference with the grand jury were the courts to require live rebuttal testimony in all
cases.") (footnote omitted); cf. Barry, 865 F.2d at 1326 (characterizing request to disclose
grand jury matters as "extraordinary"). In balancing the movants' right to discovery and
direct participation in questioning the IC or his prosecutors against the interest in
maintaining grand jury secrecy, we must inevitably give priority to ensuring that a
proceeding to enforce the protections of Rule 6(e)(2) does not ultimately subvert the rule
itself.

 B. The Appropriate Procedure
 We will now endeavor to set forth the contours of how a show cause hearing may
proceed once a prima facie case has been established, recognizing that within these
boundaries, the district court should have sufficient leeway to establish procedures it
believes will assist it best in discovering the truth of the matter while at the same time not
causing undue interference with either the work of the grand jury or that of the district court
itself. 
 We find the Eleventh Circuit's decision in Eisenberg to be the most useful precedent
on the direction the show cause hearings should take. In Eisenberg, the targets of two grand
juries filed motions in district court alleging violations of Rule 6(e)(2) and submitting as
proof various newspaper articles that reported government agents and attorneys as the source
of the information disclosed. The district court, after finding the articles conclusively
established the existence of a Rule 6(e)(2) violation, ordered counsel for the government to
identify to counsel for the targets "each government attorney, officer, agent, or employee
with access to the aforedescribed grand jury matters" as well as to furnish affidavits
executed by each such person that included the identity of any news media representative
with which they had communicated and the circumstances and substance of each
communication. Id. at 962 (internal quotation omitted). As in our case, the government in
Eisenberg did not contest the district court's conclusion that the news articles submitted
established a prima facie case or that it was required to provide the designated information
to the court for its consideration. The government did challenge, however, just as the IC
does here, any requirement that it furnish that information directly to the targets at a time
before any indictments had yet issued. Id. at 963-64.
 The Eleventh Circuit reversed the district court's order to produce information about
the press disclosure to the targets before indictments had been issued or the grand jury's
investigation had ended. Ruling that the articles established only a prima facie case, the
Court of Appeals nonetheless found it appropriate for the district court to have ordered the
government "to take steps to stop any publicity emanating from its employees" before
moving to a consideration of whether the government had in fact violated Rule 6(e)(2) by
past disclosures. Id. at 964. The court stated decisively, however, that the targets should not
be allowed to participate directly in this inquiry as to the government's culpability. Rather,
the district court should first have conducted an in camera review of the government's
proffer of evidence as to its conduct:
 [W]e do not think the court properly balanced the targets'
 interest in the information with the harmful effects that could
 follow the disclosure to targets' counsel of names of all the
 government employees involved in the investigation. . . . Such
 information could lead counsel to call upon those government
 agents and attempt to interview them; news would spread that
 the attorneys for the targets were invading the province of the
 grand jury; and prospective witnesses could be intimidated from
 testifying.

Id. at 965. As a result, the Eisenberg court held that the information identified by the district
court "should first be furnished to the district court in camera"; after reviewing this material,
the district court could then determine whether further proceedings were necessary as well
as the extent of the targets' involvement in those proceedings. Id. at 966.
 Admittedly, Eisenberg does not provide all the answers. It is not entirely clear, for
example, whether the Eisenberg court contemplated that the in camera review of the
government's rebuttal evidence might, if it failed to satisfy the judge as to the government's
innocence or guilt, be followed by a hearing in which the targets' counsel would be allowed
to participate in order to determine the existence of a violation, see id. ("The court may
subsequently determine whether a hearing should be held on the alleged government
violations of Rule 6(e) and whether counsel for targets should be present at the hearing."),
or whether the court would make the decision on the existence of a violation by itself and
invite the presence of the targets' counsel only at the remedy stage, see id. at 965 ("Once the
court determines that Rule 6(e) has been violated, the court may properly inform the targets'
counsel of the names of the violators. Targets' counsel may then play a proper role in
hearings involving imposition of contempt sanctions on government employees."). To the
extent Eisenberg can be read to suggest that counsel for Rule 6(e)(2) plaintiffs should be
permitted to play an adversarial role in the show cause hearing, we cannot agree. We do find
persuasive, however, the Eisenberg court's conclusion that in camera review of the
government's ex parte proffer is the most appropriate way to conduct proceedings in Rule
6(e)(2) cases and protect grand jury secrecy. 
 The use of in camera review in proceedings collateral to a grand jury investigation
is by no means novel. District courts are often required to conduct an in camera review of
grand jury material requested under Rule 6(e)(3)(C)(i) to determine what material, if any,
is responsive to the need asserted by the requesting party; this in camera review "is
necessary due to the paramount concern of all courts for the sanctity and secrecy of grand
jury proceedings." Lucas v. Turner, 725 F.2d 1095, 1109 (7th Cir. 1984); see also In re
Special Grand Jury 89-2, 143 F.3d 565, 572 (10th Cir. 1998); S. Rep. No. 95-354, at 8
(1977), reprinted in 1977 U.S.C.C.A.N. 527, 532 ("It is contemplated that the judicial
hearing in connection with an application for a court order by the government under
subparagraph (3)(C)(i) should be ex parte so as to preserve, to the maximum extent possible,
grand jury secrecy."). Similarly, courts often use in camera, ex parte proceedings to
determine the propriety of a grand jury subpoena or the existence of a crime-fraud exception
to the attorney-client privilege when such proceedings are necessary to ensure the secrecy
of ongoing grand jury proceedings. See, e.g., In re Grand Jury Nos. 95-7354, 96-7529 and
96-7530, 103 F.3d 1140, 1145 (3d Cir.), cert. denied sub nom. Roe v. United States, 117 S.
Ct. 2412 (1997) ("Ex parte in camera hearings have been held proper in order to preserve
the ongoing interest in grand jury secrecy."); In re Grand Jury Proceedings, Thursday
Special Grand Jury Sep. Term, 1991, 33 F.3d 342, 353 (4th Cir. 1994) ("[T]he
government's proffer [as to the existence of the crime-fraud exception] was made in camerabecause it concerned matters subject to an on-going investigation before the grand jury."). 
Although in camera, ex parte submissions "generally deprive one party to a proceeding of
a full opportunity to be heard on an issue," In re John Doe Corp., 675 F.2d 482, 490 (2d Cir.
1982), and thus should only be used where a compelling interest exists, see, e.g., In re John
Doe, Inc., 13 F.3d 633, 636 (2d Cir. 1994), we find that the nature of a Rule 6(e)(2) hearing,
particularly when conducted during an ongoing grand jury investigation, involves such a
compelling interest. See, e.g., In re Grand Jury Proceedings, 33 F.3d at 353 (holding that
"in camera proceedings in the context of grand jury proceedings and on-going investigations
requiring secrecy are not violative of due process" despite lack of opportunity to rebut
government's proffer); In re John Doe, 13 F.3d at 636 ("[W]here an in camera submission
is the only way to resolve an issue without compromising a legitimate need to preserve the
secrecy of the grand jury, it is an appropriate procedure."); In re John Doe Corp., 675 F.2d
at 490 ("We recognize that appellants cannot make factual arguments about materials they
have not seen and to that degree they are hampered in presenting their case. The
alternatives, however, are sacrificing the secrecy of the grand jury or leaving the issue
unresolved at this critical juncture.").
 In light of these concerns, we conclude that the show cause hearing in this instance
should not proceed in a fully adversarial manner when only a prima facie case has been
made. We emphasize, however, that the burden of rebutting the prima facie case will lie
with the IC, who must now come forward with evidence, in whatever form the district court
requires (including affidavits, depositions, production of documents, or live testimony) to
rebut the inferences drawn from the news articles that established the prima facie case of a
Rule 6(e) leak to the press by personnel in or "close to" the IC's office. This evidence
should be submitted ex parte and in camera for the district court's review. Because the
government must negate at least one of the two prongs of the prima facie case--by showing
either that the information disclosed in the media reports did not constitute "matters
occurring before the grand jury" or that the source of the information was not the
government--relevant evidence might include "what actually occurred before the grand jury,
whether the purported grand jury disclosures are accurate, the identities of its employees
with access to any of the grand jury information disclosed, and whether these individuals in
turn provided any such information to the media," Barry, 740 F. Supp. at 890, as well as
evidence as to the IC's general policies concerning press contacts, evidence as to the actual
source of information reported by the press, or evidence describing any actual exchanges
between a member of the IC's staff and a member of the press associated with one of the
identified reports. The district court's task at this stage is to review the IC's evidentiary
submissions and determine whether they are sufficient to rebut the movants' prima faciecase--in other words, whether the evidence presented by the government is sufficient to
render the identified press reports inaccurate either in their characterization of material as
grand jury related or in their identification of the source of the information. If the district
court determines that the IC's submission is insufficient to rebut the prima facie case, or,
indeed, if the IC or a member of his staff admit to violations, no further proceedings are
necessary, and the district court may proceed to find that a Rule 6(e)(2) violation has
occurred and determine the appropriate remedy. The announcement of the court's finding
should be available to the movants and their participation in any remedy hearing
presumptively allowed. If, on the other hand, the district court determines that the IC's
submission conclusively rebuts the prima facie case, the show cause order should be
discharged. In either event, this first stage should be ex parte and in camera in order to
minimize the intrusion on the interests protected by Rule 6(e)(2).
 If, however, after review of the government's rebuttal case the district court finds that
it cannot make an adequate determination as to whether a violation of the rule has occurred,
or if the district court cannot identify with certainty the individual or individuals responsible,
further proceedings may be appropriate. Although the district court should take care to
protect the secrecy of the grand jury investigation by continuing to conduct the proceedings
in camera and ex parte, we do not wish unnecessarily to cabin the district court's discretion
as to the type of factfinding tools it may use. The court may, for example, request further
affidavits or other types of documentary evidence from either the government or the
movants; it may request that a member of the IC's staff or another witness answer questions
of the court or questions submitted by the movants upon the court's invitation; the court
may, if it so chooses, appoint a special master or other individual to collect evidence and
submit a report to the district court for its review and adjudication. See, e.g., Eisenberg, 711
F.2d at 966 ("We can conceive of circumstances where a district court could seek the
appointment of a special counsel to assist the court in determining whether Rule 6(e)
violations had occurred.").
 If at the end of the day the district court determines that a violation of Rule 6(e)(2)
has occurred, it may report this finding to the movants and identify the government agent
or attorney responsible for the disclosure. See Eisenberg, 711 F.2d at 965. The movants
may then participate in determining the appropriate remedy, which, as we have noted, may
include equitable relief, contempt sanctions, or both, see Barry, 865 F.2d at 1321-22,
keeping in mind that the relief granted should be "carefully tailored to avoid unnecessary
interference with grand jury proceedings," id. at 1323. Finally, the district court must keep
a transcribed record of what transpired in any in camera proceeding; should the grand jury
ultimately issue indictments, the indicted party or parties may request the transcript of the
Rule 6(e)(2) proceedings in order to determine whether to contest any indictment on the
basis of the violation. See Eisenberg, 711 F.2d at 965; Fed R. Crim. P. 6(e)(3)(C)(ii)
(disclosure of grand jury matters permitted "at the request of the defendant, upon a showing
that grounds may exist for a motion to dismiss the indictment because of matters occurring
before the grand jury").

 IV.
 We are keenly aware that allegations that a government official has violated Rule
6(e)(2) are not to be taken lightly. As Justice Frankfurter noted, "[t]o have the prosecutor
himself feed the press with evidence . . . is to make the State itself through the prosecutor,
who wields its power, a conscious participant in trial by newspaper, instead of by those
methods which centuries of experience have shown to be indispensable to the fair
administration of justice." Stroble v. California, 343 U.S. 181, 201 (1952) (Frankfurter, J.,
dissenting). It is the very interests in protecting grand jury secrecy underlying the rule,
however, that call for the utmost discretion on the part of the courts to ensure that the rule
is not breached in the very act of rooting out violations. We believe the intent of Barry in
characterizing the inquiry into Rule 6(e)(2) violations as civil is honored by allowing the
movants to identify any violations of the rule and, if necessary, to participate in crafting a
remedy designed to stop further violations. Any direct participation in deciding whether a
violation has occurred and by whom should be allowed by the district court only in
extraordinary circumstances and as a last resort. The procedure we have outlined is designed
to "allow the court to focus on the culpable individual rather than granting a [discovery]
windfall" to the movants. Bank of Nova Scotia v. United States, 487 U.S. 250, 263 (1988).
 We have decided the merits of the IC's challenge to the district court orders by
granting its petition for writ of mandamus. Accordingly, we dismiss the appeal in No. 98-
3077 et al., vacate the procedural aspects of the district court's orders of June 19 and June
26, and remand for further proceedings consistent with this opinion.
 It is so ordered.