Larry D. STEWART, et al.   Plaintiffs,

v.

Paul H. O'NEILL, Secretary, U.S. Department of the Treasury Defendant.

No.  CIV.A. 90–2841.

United States District Court, District of Columbia.

Sept. 3, 2002.

MEMORANDUM OPINION
AND ORDER

LAMBERTH, District Judge.

Now before the Court is plaintiffs' Motion for an Order to Show Cause Why Respondent Paul H. O'Neill Should Not Be Found in Civil Contempt [544], defendant's Opposition thereto, plaintiffs' reply and plaintiffs' supplemental reply. Upon consideration of the pleadings, relevant decisions of prior federal courts and the record of this case, the Court hereby DENIES plaintiffs' Motion for an Order to Show Cause.

I. Background

This history of this case is set forth in the Court's Memorandum Opinion and Order approving the settlement agreement in this case. See Stewart v. Rubin, 948 F.Supp. 1077 (D.D.C.1996). In brief, plaintiffs brought an action against defendant alleging race discrimination and retaliation by the Bureau of Alcohol, Tobacco, and Firearms (ATF) with regard to a variety of personnel practices. The parties ultimately settled the case, and this Court approved that settlement in 1996. The settlement included many forms of relief, ranging from individual monetary relief to classwide equitable relief.

Plaintiffs now return before this Court seeking contempt against ATF for its alleged failures to comply with the settlement agreement. Plaintiffs allege that defendants have failed to comply with the following terms of the settlement agreement: (1) provide required statistical information; (2) install an agreed upon promotion assessment system[1]; (3) im-

---

1. A Promotion Assessment Center is a term of art used in the Industrial Relations field to

plement the equitable relief due to class members with regard to retirement contributions and retroactive promotions; (4) pay taxes due on the back pay fund established by the settlement agreement; and (5) pay the appellate official and the technical official designated by the settlement agreement. Defendant opposes the plaintiffs' motion and argues that the Court no longer has jurisdiction over the bulk of plaintiffs' claims, and that plaintiffs should be forced to bring a new case to litigate their claims. Defendant apparently concedes that the Court *does* have jurisdiction over the promotion assessment system and the data collection and analysis related to that system; as to that claim, defendant claims that he is not in violation of the settlement agreement because ATF has made its best efforts to comply with the agreement but have been hampered by technological difficulties, plaintiffs' counsel and by the independent contractors retained to prepare the statistical reports.

## II. Analysis

### A. Jurisdiction

■ Parties may not, by consent, definitively invoke or deny the Court's jurisdiction over the settlement agreement. *See Arata v. Nu Skin Int'l, Inc.*, 96 F.3d 1265 (9th Cir.1996) (upholding district court's exercise of discretion in rejecting jurisdiction despite provision in settlement agreement reserving indefinite jurisdiction over the implementation of the settlement agreement). Despite the parties' apparent agreement that the Court retains the power to enforce the provisions of the settlement agreement that relate to Promotion

Assessment System, the Court must make an independent determination of the scope of its jurisdiction.

"The enforceability of the settlement agreement is governed by ordinary principles of contract law." *See* Order of July 1, 1999, *Stewart v. Rubin*, Civil No. 90–2841(RCL) (citing *Village of Kaktovik v. Watt*, 689 F.2d 222, 230 (D.C.Cir.1982)). "Where, as here, the language of a contract is clear and unambiguous, the Court will assume that the terms of the contract carry their ordinary meaning." *Id.* In this case, the settlement agreement explicitly provided that

> [t]he Court shall retain jurisdiction over this action for four years from the Effective Date of this Settlement Agreement solely for the purpose of enforcing the Settlement Agreement. Accordingly, this Settlement Agreement shall expire and shall be without force and effect four years from the Effective Date of the Settlement Agreement.

*See* Pl. Mot., Exh. 1 (Settlement Agreement) at 33. The "effective date" of the settlement agreement was November 21, 1996. During the period of implementation of the settlement, the parties mutually agreed to several extensions of the Court's jurisdiction, so this provision regarding the Court's jurisdiction over the entire settlement agreement did not lapse until July 19, 2001.

A second provision modifies the general jurisdictional provision; the second provision extends the Court's jurisdiction over a limited section of the settlement agreement by providing that

> [n]otwithstanding [the general provision governing the Court's jurisdiction]

---

describe a standardized evaluation of candidates' knowledge, skills and abilities using a number of job-like simulations that measure those competencies determined to be critical to the target positions. *See* Def. Opp. at 16 n.

2. The Promotion Assessment Center was to be used to, among other purposes, create and implement a new performance appraisal system for ATF agents.

above, the defendant hereby agrees that its obligations under Section IV.C.1 (Data Collection), and Section IV.C.2 (Analysis of Data) shall run for a period of three years from the implementation of the new promotion assessment system specified in Section IV.C.5 (Career Development (Request for Proposals)). If this three year period exceed the period specified ... above, the Court shall retain jurisdiction for this additional time period *solely and for the limited purpose* of enforcing the obligations under Section IV.C.1 (Data Collection) and Section IV.C.2 (Analysis of Data). Once this three year period ends, those obligations also shall expire and shall be without force and effect.

*See id.,* Exh. 1 (Settlement Agreement) at 33–34 (emphasis in original).

The terms of the settlement agreement are clear; the parties intended that this Court, with the limited exception above, would have jurisdiction to adjudicate disputes stemming from the agreement for a period of four years after the Effective Date of the agreement. It is clear that the terms of the settlement agreement provide only for general jurisdiction over the settlement agreement for a period of four years and any additional period to which both parties agreed. Therefore, by the terms of the Settlement Agreement, the Court's jurisdiction over the bulk of the settlement agreement expired on July 19, 2001.

Alternatively, plaintiffs seek to extend the express limitation on this Court's jurisdiction by arguing that the Court should amend the terms of the settlement agreement pursuant to Federal Rule of Civil Procedure 60. In very specific circumstances, the Court may amend a consent decree or settlement agreement where there is a drastic, unforeseen change in circumstances. *See* Fed. R.Civ.P. 60; *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (holding that a change in consent decree may be permitted "in light of changes in circumstances that were beyond the [parties'] control and were not contemplated by the court or the parties when the decree was entered"). The only "changed circumstance" that plaintiffs are able to cite is that "[r]espondent has not complied with the four year deadline to implement the Settlement Agreement's reforms." *See* Pl. Reply at 4. This falls far short of the type of "changed circumstance" that might warrant the amendment of a settlement agreement-in the negotiation of a settlement, the negotiation of incentives and penalties that will ensure the opposing parties' compliance is an omnipresent concern.

Accordingly, the only sections of the settlement agreement over which the Court has jurisdiction are Sections IV.C.1 (Data Collection), IV.C.2 (Analysis of Data), and IV.C.5 (Promotions Assessment System).[2]

**2.** By the literal terms of the settlement agreement, it appears that the Court has no jurisdiction over the provision of the settlement agreement compelling defendant to implement the Promotion Assessment System-the implementation of that system is only defined as an event triggering the Court's continuing jurisdiction over §§ IV.C.1 and IV.C.2, but is not included as a provision over which the Court would have continuing jurisdiction. Nevertheless, the Court will assume *arguendo* for the purpose of this Motion for an Order to Show Cause that the Court does have jurisdiction over the Promotion Assessment System because defendant apparently joins in plaintiffs' belief that the Court has jurisdiction and because that assumption has no effect on the Court's ruling on the Motion for an Order to Show Cause. The Court need not, at this time, make a definitive ruling on the question of whether the Court has continuing jurisdiction over the Promotion Assessment System.

**B. Order to Show Cause**

■ It is beyond peradventure that courts have the inherent authority to enforce their orders through the exercise of their contempt powers. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). Two elements must be established before a party may be held in civil contempt. First, the Court must have issued an order that is clear and reasonably specific. *Armstrong v. Exec. Off. of Pres.*, 1 F.3d 1274, 1289 (D.C.Cir.1993). Second, the putative contemnor must have violated the Court's Order. *Id.* at 1289. It is not necessary in civil contempt proceedings for the violation of the Court Order to be intentional or for the putative contemnor to have acted in bad faith. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

■ The burden of proof in civil contempt proceedings rests on the moving party. *Food Lion, Inc. v. United Food and Commercial Workers Int'l Union*, 103 F.3d 1007, 1016 (D.C.Cir.1997). The movant must prove the two elements of civil contempt-the existence of a clear and reasonably specific Order, and a violation of the Court's Order-by clear and convincing evidence. *Id.* After the moving party makes a *prima facie* showing of civil contempt, the party charged with contempt can still defend itself on the ground of "good faith substantial compliance" with the Court Order. *Id.* at 1017. In order to raise this defense successfully, the putative contemnor must demonstrate "that it took all reasonable steps within [its] power to comply with the court's order." *Id.*

In this case, of course, the ultimate question of contempt is not before the Court; plaintiffs seek only an Order that defendant show cause why he should not be held in contempt. At this stage, plaintiffs are not required to show by clear and convincing evidence that the defendant should be held in contempt, but the Court must have some indication that sufficient evidence exists that the Court *might* find evidence sufficient to hold defendant in contempt. For the following reasons, it is apparent to the Court that at this stage, plaintiffs will be unable to prove by clear and convincing evidence that defendants should be held in contempt.

■ First, it does not appear that there was any "clear and reasonably specific order" that the defendants might have violated. Prior courts have held that in order for a party to be held in civil contempt on the basis of an alleged violation of a settlement agreement, that settlement agreement must comply with Federal Rule of Civil Procedure 65(d). *See D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455 (7th Cir.1993); *H.K. Porter Co., Inc. v. Nat'l Friction Prods. Corp.*, 568 F.2d 24 (7th Cir.1978); *Lovell v. Evergreen Resources, Inc.*, 1995 WL 761269 (N.D.Cal. Dec.15, 1995); *In Zipper*, 207 B.R. 695 (Bankr. D.Kan.1997); 11A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2955, at 309 (1995) ("The Supreme Court has indicated that the term 'injunction' in Rule 65(d) is not to be read narrowly but includes all equitable decrees compelling obedience under the threat of contempt."); *see also Int'l Longshoremen's Assn., Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 75, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967) (holding that court could not hold party in contempt for violating arbitration award because award did not comply with Rule 65(d)). That is, the terms of the settlement agreement must be set forth in an order which "shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be

restrained; and is binding upon the parties to the action ..." Fed.R.Civ.P. 65(d).

In this case, the settlement agreement was approved by the Court on November 21, 1996. *See Stewart v. Rubin*, 948 F.Supp. 1077 (D.D.C.1996). That Order *described* the settlement agreement, *id.* at 1082–86, and did describe the portion of the settlement agreement relating to the Promotions Assessment System, *id.* 1082–83. The settlement agreement, however, was never given the force of a Court Order; the Court concluded only that "the Settlement Agreement will be approved pursuant to Fed.R.Civ.P. 23(e) and Section 108 of the Civil Rights Act of 1991." *Id.* at 1107. Nowhere did the Court incorporate the actual terms of the settlement agreement into its order, such that the terms would be given the force of a Court Order; the Court's only purpose in describing the terms of the settlement agreement in its Order was to provide background and bases for its ruling approving the settlement agreement under Federal Rule of Civil Procedure 23(e) and Section 108 of the Civil Rights Act of 1991. Therefore the Court's November 1996 Order may not independently serve as the basis for civil contempt against defendant.

■ Second, even if the Court were to find that the Order was enforceable by contempt, it is extremely unlikely that the Court would find by clear and convincing evidence that defendant has violated his obligations under the Settlement Agreement. The facts leading up to the filing of the instant motion appear to be as follows.[3] In 1996, the Settlement Agreement was approved; ATF agreed to implement a Promotions Assessment System, which was intended to replace the extant "Career Development Plan" and also to minimize any adverse impacts on African–American agents. The Agreement further provided that ATF was to provide "monitoring data" to plaintiffs' counsel, which would be used to monitor the effects of personnel reforms mandated by the Settlement Agreement upon class members. As noted above, the parties agreed that the Court would continue to have jurisdiction over the data collection provisions of the Settlement Agreement until three years after the implementation of the Promotion Assessment System. At the time the Settlement Agreement was approved by the Court, the parties were hopeful that the Promotions Assessment System would be implemented within one year, although it appears that both parties knew that the time frames set forth in the agreement were "likely impossible" for the agency to meet. *See* Def. Opp. at 16 n. 2. Nonetheless, the agency was obligated to use its best efforts-that is, all reasonable efforts-to comply with all terms of the settlement agreement. Pl. Mot., Exh. A (Settlement Agreement) at 4, 23.

Pursuant to the Settlement Agreement, the Promotion Assessment System was to be implemented by an independent contractor who would be selected jointly by the parties. ATF was to use its best

---

**3.** In describing the history of the implementation of the Settlement Agreement, the Court relies upon the submissions of the parties, generally attached as exhibits to their pleadings. The Court notes that although both parties have submitted correspondence and reports, plaintiffs have failed to submit any affidavits supporting their factual assertions. The Federal Rules of Civil Procedure and prior federal courts have expressed a clear preference for the submission of affidavits and deposition testimony where possible. *See Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 160–61, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("Even though [the submission of an affidavit was] not essential here to defeat respondent's motion, the submission of an affidavit would have been the preferable course for petitioner's counsel to have followed.").

efforts to ensure that one year after the award of the contract, a "job analysis" was completed by the contractor.[4] ATF was to make its best efforts to ensure that the contractor completed a valid Promotion Assessment System, or at least a valid prototype, within one year after the completion of the job analysis. One year after the completion of the valid Promotion Assessment System, ATF was to use its best efforts to ensure that the system was actually implemented. A committee, comprised of a jointly selected expert, a representative of plaintiffs' counsel, a representative of ATF, a representative of the contractor, and another independent expert chosen by the contractor and approved by ATF, was to meet periodically to receive information from the contractor and review the progress of the development of the Promotions Assessment System. Further provisions governed the review of the Promotions Assessment System after implementation.

A contractor was selected and a job analysis was completed by April 2000, *see* Def. Opp. at 17. Although the parties agree that, as of today, the Promotions Assessment System is still not functional, ATF represents to the Court that the implementation of the first Promotion Assessment Center is scheduled to begin in October, 2002, *see* Def. Opp. at 18; *id.,* Exh. A (King Decl.) ¶ 32, at considerable cost to defendant, *see id.,* Exh. A (King Decl.) ¶¶ 23–32. Although it appears to be far off schedule, the Court accepts the representations of defendant that he is on the cusp of implementing the Promotions Assessment System. Because the system is to be implemented shortly, there would be scarce evidence for the Court to find that defendant had violated any Court Or-

der compelling defendant to use his best efforts to implement that system. In any case, it is not the Promotions Assessment System that draws the bulk of plaintiffs' ire.

Pursuant to the Settlement Agreement, ATF was further obligated to provide class counsel (or their designated expert) with statistical information in order to assess the effects of the personnel reforms on class members. Under the "data collection" provisions, ATF was required use their best efforts to maintain and update a computer data base with data about, among other topics, promotions and competitive selections, performance ratings, field office and division assignments, ATF Headquarters division assignments, group assignments, case assignments, awards and bonuses, initiation of Internal Affairs inquiries and disciplinary actions, selections for in-service training courses, selections for special teams, EEO complaints and resolutions thereof, and hiring. *See* Pl. Mot., Exh. A (Settlement Agreement) at 15–16. ATF was to use its best efforts to provide plaintiffs' counsel with all required data, and a mutually acceptable expert, jointly employed by the parties, would produce a report that analyzes the employment data to determine whether the employment practices or personnel systems at issue have had an "adverse impact" on African–American special agents. *Id.,* Exh. A (Settlement Agreement) at 16–17.

In January of 1997, representatives of ATF met with class counsel in order to determine the implementation of the data collection provisions. *See* Def. Opp., Exh. A (King Decl.) ¶ 3. At that time, the parties apparently reached an understanding that the data would generally be provided

---

**4.** The job analysis was to determine what skills and abilities were used by the special agents employed by ATF. *See* Def. Opp. at 17.

directly from ATF to the expert statistician who, at that time, had not yet been chosen. *See id.* at 22. In April 1998, ATF entered into a contract with the Center for Forensic Economic Studies ("CFES"), an expert statistician that was mutually acceptable to the parties; ATF and plaintiffs' counsel were each to pay one-half of the cost of the contract. *See id.,* Exh. A (King Decl.) ¶ 4. On May 15, 1998, ATF and CFES met to discuss the type of data available, the format of the data provided, and other issues related to the data collection obligations of ATF; ATF provided information to CFES after that meeting about certain data files and other documentation. *See id.,* Exh. A (King Decl.) ¶ 5.

On December 21, 1998, CFES sent the first request for data to ATF. *See id.,* Exh. 1 (Dec. 21, 1998 letter from CFES to King) to Exh. A (King Decl.). ATF responded to those requests on February 9, 1999 and on July 15, 1999. *See id.,* Exh. A (King Decl.) ¶¶ 6–7; *id.,* Exh. 2 (Feb. 9, 1999 letter from King to CFES) to Exh. A (King Decl.); *id.,* Exh. 3 (July 15, 1999 letter from King to CFES) to Exh. A (King Decl.). In February 1999, counsel for ATF, Michelle King, suggested to CFES that they meet with a representative from ATF to discuss two specific data bases known as CEMIS and "Training Administrator." *See id.,* Exh. A (King Decl.) ¶ 7; *id.,* Exh. 2 (Feb. 9, 1999 letter from King to CFES) to Exh. A (King Decl.). Those data bases apparently contain information about group assignments, case assignments, and selection for in-service training. *See id.,* Exh. 1 (Dec. 21, 1998 Letter from CFES to King) to Exh. A (King Decl.); *id.,* Exh. 2 (Feb. 9, 1999 Letter from King to CFES) to Exh. A (King Decl.); *id.,* Exh. 3 (July 15, 1999 Letter from King to CFES) to Exh. A (King Decl.). On July 15, 1999, that meeting had not yet occurred, and King contacted CFES again with regard to scheduling that meeting. *See id.,* Exh. A (King Decl.) ¶ 8; *id.,* Exh. 3 (July 15, 1999 letter from King to CFES) to Exh. A (King Decl.). In the fall of 1999, King contacted CFES to inquire about the status of an initial analysis. *See id.,* Exh. A (King Decl.) ¶ 9. On October 19, 1999, CFES provided an update, indicating that they were ready to proceed with the initial analysis of many of the categories of data, and that they expected to have the analysis complete within a month of receiving ATF's approval. *See id.,* Exh. A (King Decl.) ¶ 9; *id.,* Exh. 4 (Oct. 19, 1999 Memo from CFES to King) to Exh. A (King Decl.). CFES also indicated that they were waiting for further information from Daniel Clark. *See id.,* Exh. 4 (Oct. 19, 1999 Memo from CFES to King) to Exh. A (King Decl.). On November 23, 1999, King sent an email to CFES, approving the initial analysis, suggesting that CFES provide an initial analysis of data covering the period through December 1998 and then provide an update shortly thereafter covering the period through December 1999, and reminding them about the proposed meeting regarding CEMIS and the "Training Administrator." *See id.,* Exh. A (King Decl.) ¶ 10; *id.,* Exh. 5 (Nov. 23, 1999 Email from King to CFES) to Exh. A (King Decl.).

On January 10, 2000, King sent to CFES information regarding the "Training Administrator" data base. *See id.,* Exh. A (King Decl.) ¶ 11. On January 18, 2000, ATF received a memorandum from CFES requesting information about the CEMIS data that had thus far been provided to them for analysis. *See id.,* Exh. A (King Decl.) ¶ 12; *id.,* Exh. 6 (Jan. 18, 2000 Memo from CFES to King) to Exh. A (King Decl.). On February 7, 2000, ATF provided CFES with much of the requested information. *See id.,* Exh. A (King Decl.) ¶ 13; *id.,* Exh. 7 (Feb. 7, 2000 Memo

from King to CFES) to Exh. A (King Decl.). In June 2000, information about the data fields in the applicant tracking system was sent to CFES, at the request of CFES. *See id.*, Exh. A (King Decl.) ¶ 14; *id.*, Exh. 8 (June 1, 2000 Fax from King to CFES) to Exh. A (King Decl.).

In a subsequent conversation with King on June 29, 2000, CFES indicated that they had completed their initial analysis, and that the written report would be issued by CFES shortly. *See id.*, Exh. A (King Decl.) ¶ 15. A draft report was issued by CFES on October 25, 2000; a final written report has not yet been issued. *See id.*, Exh. A (King Decl.) ¶ 15.

On March 23, 2001, after speaking with plaintiffs' counsel, King sent an email to CFES summarizing the work that needed to be done by CFES; King told CFES that before a final report could be issued, CFES would have to incorporate data from the year 2000, and that King would send them the data in the format it had used for prior communications of data. *See id.*, Exh. A (King Decl.) ¶ 16; *id.*, Exh. 9 (Mar. 23, 2001 Email from King to CFES) to Exh. A (King Decl.). King also told CFES that she had data that was ready for transmittal to CFES, but that she was waiting for CFES to tell her the type and format that CFES preferred. *See id.*, Exh. 9 (Mar. 23, 2001 Email from King to CFES) to Exh. A (King Decl.).

During April, May and June 2001, CFES and ATF continued discussions about the type of data needed; ATF did provide some data in response to requests by CFES. *See id.*, Exh. A (King Decl.) ¶¶ 17–18; *id.*, Exh. 10 (Apr. 5, 2001 Letter from CFES to King) to Exh. A (King Decl.). Between June and October 2001, updated data on personnel actions was provided to CFES, and CFES made additional requests for information. *See id.*, Exh. A (King Decl.) ¶¶ 21–22; *id.*, Exh. 11

(Oct. 31, 2001 Email from CFES to King) to Exh. A (King Decl.).

On September 6, 2001 plaintiffs' counsel sent a letter to Associate Chief Counsel for ATF, Eleanor Loos, expressing frustration at the difficulty in obtaining data. *See* Pl. Mot., Exh. 7 (Sept. 6, 2001 Letter from Pl. Counsel to Loos). On November 19, 2001, Loos sent a letter to plaintiffs' counsel, acknowledging the fact that it had been difficult to obtain data from ATF; Loos informed plaintiffs' counsel that one possible helpful contact within ATF would be Daniel Clark, Personnel Management Specialist for ATF. *See* Pl. Mot., Exh. 8 (Nov. 19, 2001 letter from Loos to Pl. Counsel); *see also* Def. Opp., Exh. 2 (July 15, 1999 letter from King to CFES) to Exh. A (King Decl.) (recommending that CFES contact Daniel Clark directly for statistical information). Plaintiffs' counsel did not contact Clark; Clark only had minimal contact with CFES. *See* Def. Opp., Exh. C (Clark Decl.) ¶ 3.

Defendant essentially blames CFES for the failure of the parties to produce a statistical report analyzing the effects of the personnel reforms on the class members. Since the filing of the Motion for an Order to Show Cause, ATF has taken action to replace CFES, although ATF may not unilaterally do so. *See* Def. Opp. at 25–26.

Plaintiffs, together with CFES, blame ATF for the failure of the parties to produce the statistical report. CFES has produced two reports, one on May 2, 2002 and the second in June 2002, asserting that ATF did not respond to requests for information, that ATF had never requested reports, and that ATF failed to update existing databases. *See* Pl. Reply, Exh. 4 (May 2, 2002 CFES Rept.); Pl. Suppl. Reply, Exh. 1 (June 2002 CFES Rept.). Specifically, CFES asserted in its reports that they have not yet been provided with

any data files relating to group assignments, case assignments, or selection for in-service training, nor was CFES aware of any database addressing selection for Special Teams other than some limited information on certain vacancy announcements. *See* Pl. Reply, Exh. 4 (May 2, 2002 CFES Rept.) at 2. The record on those categories of information is muddled; as noted above, it appears that that information was contained in the CEMIS and "Training Administrator" data bases. Defendant asserts that King contacted CFES repeatedly about those data bases and that CFES never responded to her attempts to schedule a meeting with CFES. *See* Def. Opp., Exh. A (King Decl.) ¶¶ 7–8; *id.*, Exh. 2 (Feb. 9, 1999 Letter from King to CFES) to Exh. A (King Decl.); *id.*, Exh. 3 (July 15, 1999 Letter from King to CFES) to Exh. A (King Decl.); *id.*, Exh. D (ATF Data Base Chart) at * (asserting that "ATF made numerous efforts to lay the groundwork with CFES for them to get this information ... [o]ffers to meet went unanswered"). On October 19, 1999, however, it appears that CFES sent a memorandum to King asserting that they were awaiting information about those databases from Daniel Clark, *see id.*, Exh. 4 (Oct. 19, 1999 Memo from CFES to King) to Exh. A (King Decl.); Clark's Declaration makes no mention of those pending requests, *see id.*, Exh. D (Clark Decl.).

Lastly, CFES asserts that they sent a request to ATF on January 23, 2002, shortly before the filing of plaintiffs' Motion for an Order to Show Cause, indicating CFES' intention of issuing an updated statistical report, and requesting further information from ATF such as statistical information about the individuals hired to fill the vacancy announcements and other necessary clarifications to the data previously provided by ATF. CFES asserts that ATF never responded to the January 23, 2002 request, but plaintiffs fail to provide

any evidence of the requests that were allegedly sent to ATF.

The alleged actions-or failures to act-on the part of ATF would not incline this Court to find that defendant in contempt. First, the Court notes that plaintiffs have provided only the reports of CFES-the contractor who ATF now seeks to replace-to substantiate their allegations against ATF. The CFES Reports do cite communications which were, according to CFES, sent to ATF but to which ATF never responded, *see* Pl. Reply, Exh. 4 (May 2, 2002 CFES Rept.) at 2; Pl. Suppl. Reply, Exh. 1 (June 2002 CFES Rept.) at 2, but plaintiffs have not produced any evidence of those communications, nor have they produced any affidavits or deposition testimony establishing the existence of those communications. Second, assuming *arguendo* the veracity of the allegations by plaintiffs and CFES, ATF (1) failed to "actively" seek work product from CFES; (2) failed to provide some information-although CFES indicated their readiness to produce a preliminary report without that information, *see* Def. Opp., Exh. 4.(Oct. 19, 1999 Memo from CFES to King) to Exh. A (King Decl.), and did not respond to ATF's invitation to hold meetings to discuss that information, *see* Def. Opp., Exh. A (King Decl.) ¶¶ 7–8; *id.*, Exh. 2 (Feb. 9, 1999 Letter from King to CFES) to Exh. A (King Decl.); *id.*, Exh. 3 (July 15, 1999 Letter from King to CFES) to Exh. A (King Decl.); *id.*, Exh. D (ATF Data Base Chart) at * (asserting that "ATF made numerous efforts to lay the groundwork with CFES for them to get this information ... [o]ffers to meet went unanswered"); and (3) failed to respond to a memorandum sent on January 23, 2002. Particularly when viewed against the background of active communication and information transfer between the parties, as evidenced by defendant's affidavits and the

parties' exhibits, these miscommunications and errors-certainly to be expected in the implementation of reforms of this magnitude in an agency like ATF-would fall far short of the evidence necessary to hold defendant in contempt.

III. Conclusion

The Court DENIES plaintiffs' Motion for an Order to Show Cause because plaintiffs' will not able to show by clear and convincing evidence that there was a "clear and reasonably specific order" that defendant might have violated, and even assuming *arguendo* that there had been such an Order, it is unlikely that plaintiffs would be able to prove a violation of defendant's duty to make his best efforts to comply with the terms of the settlement agreement.

The Court does note that it appears that the implementation of some terms of the settlement agreement-in particular, the Promotion Assessment System and the data collection and analysis-is far behind the schedule envisioned by the agreement. Even though there is insufficient basis for the Court to issue an order to show cause, plaintiffs may seek to take other action to enforce the settlement, which would not require the Court to find that defendant's actions were in contravention of court order. The Court expresses no view at this time on such possible action, but does express the view that the parties should make a renewed effort to work jointly to solve the remaining issues before they are again presented to the Court.

SO ORDERED.